**WESTERN ADDITION COMMUNITY ORGANIZATION et al., Plaintiff,**

v.

**Robert WEAVER, Secretary of the United States Department of Housing and Urban Development, et al., Defendants.**

No. 49053.

United States District Court
N. D. California.

Dec. 16, 1968.

Gilbert T. Graham, Peter E. Sitkin, San Francisco, Cal., Steven J. Antler, Jack Greenberg and Michael Davidson, New York City, for plaintiff.

Cecil F. Poole, U. S. Atty., and David R. Urdan, Chief Asst. U. S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is a class action brought under the Federal Housing Act of 1949, 42 U.S.C. § 1441 et seq. and under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. by plaintiff, Western Addition Community Organization (WACO), an unincorporated association composed of individuals and organizations in the Western Addition area of San Francisco, on behalf of residents about to be displaced from their homes by construction of Western Addition Area II Urban Renewal Project.

The purpose of the suit is to obtain a declaratory judgment and an injunction prohibiting the Secretary of the United States Department of Housing and Urban Development and the Commissioner of the Federal Housing Administration, from continuing to approve and finance Western Addition Area II Urban Renewal Project.

The case is now before the court on plaintiff's application for a preliminary

injunction and upon defendants' motion to dismiss.

Plans of the San Francisco Redevelopment Agency for Western Addition Area II Project were first presented to the public on April 14, 1964 and hearings were conducted by the local agency as required by 42 U.S.C. § 1455(d). The San Francisco Board of Supervisors approved the Redevelopment Agency's application for federal financing on October 13, 1964. On June 30, 1966, the Secretary, acting under Section 1451(c) certified San Francisco's "workable program for community improvement" under a certificate which by its own terms was to expire on June 30, 1967. The Secretary, however, acting under Section 1455(c) (2), required the Redevelopment Agency to reappraise its relocation plans. On June 30, 1967, the Redevelopment Agency submitted a second relocation plan but the Secretary still considered it to be inadequate. On August 15, 1967, the Redevelopment Agency submitted a third relocation plan which is a subject of dispute in the pending case.

The record shows that the Secretary took no action one way or the other concerning this third relocation plan of August 15, 1967 until July 29, 1968, nearly a year after its submission by the local agency, nearly seven months after the commencement of this law suit and shortly after an order of this court, dated June 26, 1968, directing the Secretary to produce the administrative record.

Meanwhile, and notwithstanding the absence of any approval of the local agency's relocation plan, the Secretary continued from May 15, 1967 through September 17, 1968, to honor the local agency's requisitions for financing of the project.

On October 23, 1967, the San Francisco Board of Supervisors requested the Redevelopment Agency to suspend acquisition of property and displacement of Western Addition residents but this resolution was vetoed by the Mayor.

Plaintiffs, who had filed an administrative protest with the Secretary on August 9, 1967, commenced this action on December 15, 1967 in the United States District Court for the District of Columbia from which it was transferred on March 27, 1968 without any ruling on the issues, to this Northern District of California where it came on for first hearing on May 2, 1968.

Relying upon the complaint and affidavits, reports and other exhibits on file in support of the motion for preliminary injunction, plaintiffs, residents of the redevelopment area and about to be displaced by the project, contend (1) (Complaint, Count I) that the "relocation plan" of the Redevelopment Agency does not in fact meet the requirements of Section 1455(c) and that the Secretary's approval of it has been arbitrary and without actual basis; (2) (Complaint, Count II) that since June 30, 1967, there has been no certification of a "workable program for community improvement" as required by Section 1451(c)—all in violation of the Housing Act and also (Complaint, Count III) in violation of the rights of plaintiffs to group free speech and assembly under the First and Fifth Amendments.

Defendants oppose the application for preliminary injunction and also move to dismiss the suit upon the grounds that the actions of defendant officials are not subject to judicial review and, further, that plaintiffs have no legal standing to maintain this suit.

## THE RELOCATION PLAN—
## SECTION 1455(c) (1), (2)

We will first consider Section 1455(c) (1) which deals specifically with "relocation" matters (as distinguished from the "workable program for community development"). The section provides that contracts and grants shall be made only with a duly authorized public agency (in this case the San Francisco Redevelopment Agency), and that this contract shall require that there be a "feasible method" for temporary relocation of individuals and families displaced from the urban renewal area, and that there are, or are being provided, in the urban re-

newal area, or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban renewal area, decent, safe and sanitary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment.

It will be noted that Section 1455(c)(1) does not in terms require the Secretary to approve the local agency's plan for relocation. It merely requires that the contract entered into between the Secretary and the local agency must contain the relocation provisions therein set forth.

Section 1455(c) also provides, however, that the Secretary shall issue rules and regulations implementing the act by requiring that there be established, at the earliest practicable time for each urban renewal project involving the displacement of individuals, families and business concerns, a "relocation assistance program."

The Urban Renewal Manual, Section 10–1, provides accordingly that the local agency shall "assure the Secretary that the project will not result in a reduction of the supply of dwellings available in the community to minority group families and that this requirement is in recognition of the generally limited supply of housing available for their families and, further, that a project which will result in a substantial net reduction in the supply of housing in the project area available to minority group families may be undertaken only if (1) standard housing replacing the loss is provided elsewhere in the community in new or existing dwelling units not previously available to the minority group * * *."

In 1965 Congress adopted an amendment, subsection 1455(c)(2), which provides that, as a condition to further assistance after August 10, 1965, with respect to each urban renewal project, the Secretary shall require, within a reasonable time prior to actual displacement, "satisfactory assurance" by the local public agency that decent, safe and sanitary dwellings, as required by subsection (c)(1), are available for the relocation of each such individual and family.

Obviously, this 1965 amendment was adopted to make doubly sure that the Secretary would police the local agency's performance of its contractual relocation obligations. It expressly requires the Secretary to obtain "satisfactory assurance" from the local agency within a reasonable time, prior to actual displacement of property owners and residents, that decent, safe and sanitary dwellings, as required by subsection (c) (1), are really available.[1]

Defendant contends that this 1965 amendment, subsection (c) (2), obliging the Secretary, as a condition to further assistance after August 10, 1965, to require "satisfactory assurance" that adequate relocation is available, is inapplicable to the Western Addition project because the amendment provided that it was applicable only to urban renewal projects that received federal recognition *after* the effective date (August, 1965) of the new section. In this respect defendant contends that federal recognition of the Western Addition project within the meaning of "federal recognition" as defined in Section 1460(k), occurred prior to August, 1965, the effective date of the amendment, with the execution of a contract for financial assistance in planning of the project.

There is no dispute, however, that the Secretary has in fact followed and applied this 1965 amendment to the Western Addition Project just as if it were legally applicable to it.

---

1. In 1966 the Congress adopted a further amendment, Section 1455(f), which provides that the redevelopment will provide a number of units of standard housing of low and moderate cost and result in marked progress in serving the poor and disadvantaged people living in slum and blighted areas.

Further, entirely apart from subsection (c) (2), defendants' own regulations, enacted pursuant to subsection (c) (1), e. g., Urban Renewal Manual, Sec. 10–1, already noted, provides that the local agency must "assure" the Secretary concerning the relocation situation.

The issue raised by plaintiff is whether the Secretary has acted in compliance with the above stated provisions of the Federal Housing Act and more specifically, whether the Secretary has determined that the assurances given by the local agency in its third relocation plan of August 15, 1967, are "satisfactory", within the meaning of subsection (c) (2), and, if so, whether such determination of satisfactoriness has such a basis in fact as to make it a legally supportable exercise of the discretion vested in the Secretary *or* whether, as contended by plaintiff, his belated determination of "satisfactoriness" has been so made without any basis in fact as to be unreasonable, arbitrary and legally unsupportable as an exercise of the Secretary's discretion or as a compliance with the statute.

In order to ascertain the facts bearing upon this issue, this court, acting on its own motion, entered an order herein on June 26, 1968, setting aside a previous order of submission and directing the defendant Secretary to produce the complete administrative record of all proceedings taken in connection with Western Addition Area II. Defendant complied with this order by filing the voluminous record and, after further hearing and further discovery by plaintiff, the court resubmitted plaintiffs' motion for preliminary injunction and defendants' motion for dismissal.[2]

This administrative record discloses that by letter, dated July 29, 1968, Robert Pitts, Regional Administrator of HUD in San Francisco, acting on behalf of the Secretary, advised the local agency that its relocation plan of August 15, 1967, was acceptable with certain conditions. (Court's Ex. No. 1)[3]

That letter of July 29, 1968, recites that the Regional Administrator has carefully reviewed the relocation data and information submitted by the local agency under date of August 15, 1967 and that the Regional Administrator has taken into consideration certain subsequent developments and events. The Regional Administrator then determined that "In the light of all such factors we have determined and you are hereby advised that such assurance respecting the relocation plan for Western Addition A–2 Project is acceptable and satisfactory as of this time *predicated, however, upon the following * * *.*" (emphasis added):

Then follow four contingencies:

"1. Availability and utilization of relocation aids under the pending Housing and Urban Development Act of 1968 and related appropriation bills;

"2. Adoption by the Board of Supervisors of a resolution or resolutions, satisfactory to the Regional Administrator, specifying the purposes for which money previously appropriated ($300,000) shall be expended, including amounts for rent supplements, and the organizational unit or units having control of such appropriations and expenditures;

"3. The further implementation of 221(d) (3) housing in Western Addition A–2 and the other two projects in accordance with the statements set forth in my letter to you of July 19, 1968; and

"4. Appropriate and satisfactory phasing of relocation activities in an orderly and progressive manner so that site occupants, to the extent feasible, may be relocated within the project area with a minimum of hardship, and that such phasing be over such period of time (presently estimated to be ap-

2. The court's order of June 26, 1968 also directed that the San Francisco Redevelopment Agency be made a party to this suit as an agency falling within the terms of Rule 19(a) (1) and 2 (i) (ii).

3. Court's Ex. No. 1 is attached to Defendants' Supplement to the Record, filed July 29, 1968.

proximately five years) as may be needed for provision of the required housing."

The letter then concludes as follows:

"To the extent that relocation of families or individuals are dependent upon the accomplishment of the foregoing actions, and such actions cannot be carried out, the Redevelopment Agency shall not proceed with such relocation *unless* other resources meeting the standards of Section 105(c) (1) are demonstrated to my satisfaction as being available." (emphasis added).

As to these four contingencies the record shows:

As to contingency No. 1 (availability and utilization of relocation aids under the Urban Redevelopment Act of 1968 and related appropriation bills then pending in the Congress), that the legislation referred to had not yet been passed by the Congress and that any such legislation was then something for the future.

As to contingency No. 2 (a resolution of the Board of Supervisors) that such a resolution was adopted in about May, 1968, but the resolution does not satisfactorily specify the purposes for which the $300,000 previously appropriated, will be used.

As to contingency No. 3 (further implementation of 221(d) (3) housing) that no such further implementation has been possible because the necessary appropriations have not yet been made.

As to contingency No. 4 (appropriate and satisfactory phasing of relocation plans) that any such phasing has not yet been worked out and probably cannot be worked out until other contingencies have been substantially met.

It will be observed that the Regional Director's determination of satisfactoriness has been made entirely contingent on future accomplishments and events. That the determination was advisedly made in this form is clear from an examination of data which had been placed before the Regional Director by his staff concerning the local agency's relocation plan.

As far back as August 29, 1967, shortly after the submission of the agency plan, the Assistant Regional Administrator for Program Coordination and Services (Tolan) advised the Regional Director (Pitts) (Plts. Ex. E): "We generally concur with the LPA's analysis that there is need for additional aids, either local or federal, to budget the deficits in the housing supply for families and the monetary supplement of means for families and singles needed to meet the rents in public or private housing * * *. In summary, it is our opinion that the relocation of the single persons displaced from the project area will be feasible, taking into account all concurrent displacements, *providing* funds are made available to supplement the incomes of those unable to pay the required rentals * * *. There is a deficiency of 689 (one through five bedroom) units. In addition there are 459 families whose income is insufficient to meet the minimum Public Housing Rent Requirements * * * Since the timing on the availability of these newly constructed or rehabilitated units is an important factor and, at this time, we are unable to fix a date, the relocation period may have to be extended beyond five years and definite phasing scheduled." (emphasis added)

A memorandum from Director, Relocation Branch (Conlin) to the Assistant Regional Administrator (Tolan) dated August 21, 1967 (Plts. Ex. A) reviews the local agency's relocation plan, stating: "The LPA by its own admission, concedes that there is a deficit in supply for singles and families. The LPA proposes several possible solutions—(1) Increase in the welfare grant for shelter to the maximum allowable; (2) Reduce minimum rents in public housing and admit non-elderly singles; (3) local rent subsidy."

The memorandum then comments on each of the local agency's three "possible solutions," as follows:

As to (1)—increase in welfare grants —the memorandum states: "This could offer some solution but we have no evidence of how many are on relief or ap-

proximately how many may be eligible for relief. The LPA's experience to date has not been cited as to referrals to the Welfare Department."

As to (2)—reduction of public housing rentals—the memorandum states: "The second proposed solution to reduce the minimum rent for low rent public housing and for Section 23 leased housing has been turned down by the LHA (Local Housing Agency) as being impossible as it would jeopardize its financial responsibility."

As to (3)—local rent subsidy—the memorandum states: "As to local rent subsidy the Mayor has turned down this request very recently and has stated he wishes to see the outcome of the federally assisted rent income proposal now before the Congress."

The memorandum concludes: "It should be noted that the entire relocation plan is based on turnover with the exception of 200 units of new public housing which will not be available. Despite the discrepancies in the two sets of Forms H–6122 regarding the supply available, and the questionable reliability of the technique of estimating availability of hotel rooms, there is still a deficiency as acknowledged by the LPA."

A memorandum dated August 29, 1967, from the Relocation Staff (Plts. Ex. L) concludes: "In summary, a feasible relocation program can be developed *if* the city (a) completes the Housing for Displaced Persons element of the workable program and submits it to HUD in approvable form; (b) assign funds for rent supplement payments to families and individuals who would be otherwise unable to afford standard housing." (emphasis added).

Other staff reports, made during August, 1967, point out in one way or another such deficiencies of the local agency's relocation plan that any determination of "satisfactoriness" could not be reasonably made unless entirely contingent on future events and accomplishments. See, Memorandum, Federal Housing Adm. (Timmel), dated August 10, 1967 (Plt. Ex. D); Assistant Regional Adm. for Equal Opportunity (C. R. Johnson), dated August 18, 1967 (Plt. Ex. J); Assistant Regional Adm. for Housing Assistance (Ambler), dated August 16, 1967 (Plt. Ex. B); Economic Market Analysis Branch (McCreary), dated August 21, 1967 (Plt. Ex. C).

As recently as March 7, 1968, the Assistant Secretary Washington, D. C. (McCabe) wrote to the Regional Administrator (Pitts) San Francisco, a memorandum dated March 7, 1968 (Plt. Ex. H) rejecting a request from the Regional Administrator for permission to waive contract provisions on the use of project funds to allow the San Francisco Redevelopment Agency to use project funds for rental deposits. In support of the rejection the Assistant Secretary states:

" * * * This conclusion was reached reluctantly since we are fully aware of the Agency's need for assistance in the provision of adequate resources for those it is displacing. On the other hand, the Department cannot ignore the fact that there is a serious shortage of low and moderate cost housing in San Francisco. We do not believe that Federal funds should be expended to permit the San Francisco LPA to capture available units and hold them for those it displaces, without regard to other demand, in a housing market in which there are virtually no vacancies.

" * * * The Department is presently preparing implementation of a policy which will state that no community with less than a three per cent vacancy rate will be permitted to rely upon the existing housing supply for relocation resources. It is less than three per cent. The shortage of housing resources, coupled with the magnitude of displacement occurring by reason of the execution of several urban renewal and code enforcement projects in the city, makes us seriously question the wisdom of using Federal funds in this manner."

Upon this record the court can well understand why the Secretary refrained for a year from making any official deter-

mination, one way or the other, concerning the satisfactoriness of the local relocation plan. It was just *not* satisfactory. When pressed by this court's order of June 26, 1968 for production of evidence that the law was being complied with, all that the Secretary could then honestly do was to make a belated determination of "satisfactoriness" with one hand and then take it back with the other by making that determination entirely contingent on future events and accomplishments. Without these contingencies, a determination of satisfactoriness just could not have been reasonably made because the evidence before the Secretary was all to the contrary. Thus, the letter of July 29th is an expression of satisfaction in form only and must be treated as in fact an expression of *un*satisfactoriness. If considered at all as an expression of satisfaction with the plan, it would have to be considered for legal purposes as completely arbitrary and without basis in fact.

█ Thus, the record shows that there has been no compliance by the local agency with the contractual provisions required by Section 1445(c) (1), i. e., that there be a feasible method for temporary relocation of individuals and families displaced from the urban renewal area and that there are, or are being provided, in the area, or in other areas—not less desirable in regard to public utilities and public and commercial facilities and at rents within the financial means of the individuals and families displaced from the area, decent, safe and sanitary dwellings, equal in number of and available to such displaced individuals and families and reasonably accessible to their places of employment.

Further, the record shows that there has been no determination in any legal sense that the purported assurances given by the local agency in its relocation plan of August 15, 1967, are "satisfactory" to the Regional Director within the meaning of Section 1455(c) (2) or his own regulation, which provides that the Secretary shall require within a reasonable time prior to actual displacement "satisfactory assurance" that decent, safe and sanitary dwellings, as required by subsection (c) (1) are available for the relocation of each displaced individual or family.

Nevertheless, the Secretary has continued to honor the local agency's requisitions for financing by advancing to the project $3 million for capital in June, 1967 and $3.7 million (for capital) and $159,000 (for relocation assistance) in September, 1967.

The court concludes, however, that it is not necessary for the protection of the plaintiffs' interests to now indicate any invalidation of these payments or to immediately and unconditionally restrain future similar financing of the project— although that power is reserved by the court to the extent hereinafter set forth. To completely restrain federal financing at this point might in the long run injuriously affect the whole project and all concerned—including plaintiffs themselves.

█ It is necessary, however, in order to protect the interests of plaintiffs and residents of the area faced with displacement, to restrain the defendant, San Francisco Redevelopment Agency, from proceeding with the enforced displacement of residents of the project area (individuals or families, owners, tenants or occupants of property in the area), by condemnation or eviction or threats of condemnation or eviction, pursuant to any powers granted to it by the State of California or the City and County of San Francisco for urban redevelopment of Western Addition Project, which has been thus far financed by federal funds under the provisions of the Federal Housing Act, unless and until the local agency has submitted to the Secretary a relocation plan, satisfactory to the Secretary and approved by this court, which will assure that decent, safe and sanitary housing is reasonably available to such persons within the meaning of the local agency's obligation assumed under its contracts with the Secretary under the provisions of the Federal Housing Act.

To the extent that relocation of families or individuals is dependent upon the accomplishment of the contingencies set forth in the Regional Director's letter of July 29, 1968, already set forth, and such contingencies have not been accomplished sufficiently to assure decent, safe and sanitary relocation housing meeting the standards of Section 1455(c) (1) to any individual or family threatened with displacement as above set forth, the local agency shall not proceed with the displacement.

This court recognizes that the "satisfactoriness" of the local agency's relocation plan can be and in practice will probably have to be determined, not once and for all, but under a plan for phased displacement and relocation according to the progress of demolition and according to availability of adequate relocation housing sufficient to reasonably accommodate such individuals and families as may be affected by each phase of dislocation.

At the present time, however, individuals and families in the area do not have any assurance of such protection and are left for all practical purposes to the pleasure of the local agency and of the federal financing agency as to when, how and under what conditions they can be involuntarily displaced or threatened with such displacement.

The interests of plaintiffs, individuals and families similarly situated, require injunctive protection because, absent such injunctive relief from this court, such individuals and families would remain uncertain and insecure in their residence within the project and, being under the impression that their displacement from their present residences can be legally enforced, such individuals and families may well conclude that they must leave the area notwithstanding the absence of reasonably available relocation housing within the meaning of Section 1455(c) (1).

The interests of plaintiffs, individuals and families similarly situated, require the further protection of restraint upon the Secretary to the extent that he be enjoined from honoring future requisitions from the local agency for Western Addition II federal financing, until and unless, upon further application to this court, he can show that the relocation plan of the local agency is in fact satisfactory to him to the extent, at least, that it assures reasonable and present availability of decent, safe and sanitary housing, within the meaning of Section 1455(c) (1) and (c) (2) for any individuals or families about to be displaced by condemnation, eviction or threats of condemnation or eviction.

This injunctive relief does not mean that this court is presumptuously attempting to administer the complexities of urban redevelopment. That is not the function of the court nor is the court administratively equipped to do so. Nor does it mean that this court is attempting to substitute its judgment for that of the Secretary concerning the "satisfactoriness" of the local agency's relocation plan.

Our decision simply means that the court can and should see to it that the Secretary complies with the requirements of the federal statute, and his own regulations, not merely in form but in substance, and that the administrative discretion vested in him by law is not arbitrarily abused, as in this case, but is reasonably exercised with some substantial basis in fact to support it. Such is the traditional function of the court upon review of administrative action of the kind here involved.

### DEFENDANTS' MOTION TO DISMISS —JUDICIAL REVIEW—STANDING OF PLAINTIFFS TO SUE

Defendants' motion to dismiss the suit is based upon the grounds (1) that the action of the Secretary is not subject to judicial review, and (2) that in any event plaintiffs herein do not have standing to obtain judicial review.

Since matters outside of plaintiffs' pleading have been presented and not excluded by the Court, the motion to dismiss will be treated as one for summary judgment as permitted by F.R.Civ.P. 12 (b).

So far as judicial review is concerned, Section 1455(c) (1), (2) contains

**442**

no provision one way or the other, on that subject. The test for judicial reviewability, however, is not, as contended by defendants, whether the statute provides for it, but whether the statute precludes it. Federal administrative action is subject to judicial review unless the statute, itself, precludes such review.

In Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court, dealing with the Federal Food, Drug and Cosmetic Act, held that judicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason, shown by clear and convincing evidence, to believe that the intent of the Congress is to preclude such judicial review and that this rule has been reinforced by the Administrative Procedure Act embodying the basic presumption of judicial review to one suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.

■ When no other remedy for judicial review is provided, persons suffering legal wrong because of administrative action or otherwise adversely affected or aggrieved by it within the meaning of a relevant statute, may proceed under the Administrative Procedure Act (5 U.S.C. §§ 701, 702, 704) except to the extent that statutes preclude judicial review or agency action is committed to agency discretion by law.

■ In the pending case, the Housing Act does not commit to the Secretary's discretion the matter of requiring, prior to displacement, satisfactory assurance that the local agency is in compliance with its contractual obligations concern-

ing adequate and available relocation housing. The provisions of Section 1455 (c) (1) and (c) (2), concerning availability of adequate relocation housing for displacees, are expressed in mandatory terms. The Housing Act, therefore, does not commit that matter "to the agency's discretion" within the meaning of the Administrative Procedure Act.

The only area of discretion vested in the Secretary is the "satisfactoriness" of the local agency's required assurance of compliance with its contractual obligations.

■ Although this provision for "satisfactory" assurance vests considerable discretion in the Secretary, it does not mean that the exercise of it has been so far "committed to agency action by law, within the meaning of the Administrative Procedure Act, as to entirely preclude judicial review of an arbitrary abuse of the discretion—as in the present case.[4]

In Cappadora v. Celebrezze, 356 F.2d 1 (2d Cir. 1966) the Court, dealing with this point as presented by the Social Security Act, held that similar action by an administrative agency, although a matter of discretion to considerable extent, is not wholly immune from judicial examination and that it is reviewable under the Administrative Procedure Act for abuse of discretion, saying at pages 5–6:

"* * * The question thus is whether the Act 'so far' commits decision to reopen to agency discretion that a refusal would not be open to review even in case of abuse. The fact that reopening is a matter of agency discretion to a considerable extent * * * does not lead inevitably to a conclusion that such an exercise of administrative

4. If Congress had intended to completely immunize the Secretary from judicial review concerning the proper exercise of this discretion, it could easily have said so as it did in Section 1465(e) which, dealing with the amount of relocation assistance payments to individuals and families, provides that determination of such amount by the Secretary "shall be final and conclusive for any purposes and not subject to redetermination by any court or any other office." The presence of this language in Section 1465 (e) and its absence from the relocation provisions of Section 1455(c) significantly indicate that there was no intent of Congress to immunize the Secretary from traditional judicial review of his determination of the satisfactoriness of the local agency's relocation plan.

power is wholly immune from judicial examination; § 10(e) of the APA expressly authorizes the courts to set aside any administrative decision constituting an abuse of discretion. The question is whether the Secretary in deciding not to reopen enjoys absolute discretion—whether such a decision is totally committed to the judgment of the agency because of the practical requirements of the task to be performed * * *. Absent any evidence to the contrary, Congress may rather be presumed to have intended that the courts should fulfill their traditional role of defining and maintaining the proper bounds of administrative discretion and safeguarding the rights of the individual. See 4 Davis, Administrative Law, Treatise § 28.21 (1965 pocket part, p. 31); Jaffe, Judicial Control of Administrative Action 372 (1965)."

■ We conclude, therefore, that the Secretary's action now under consideration is subject to judicial review—at least to the extent of determining whether the Secretary's discretion concerning the satisfactoriness of the relocation plan has been exercised not arbitrarily but reasonably upon some substantial and supporting factual basis.

So far as standing to sue is concerned, this Court is mindful that in 1963 our Ninth Circuit Court of Appeals in Johnson v. Redevelopment Agency of the City of Oakland, 317 F.2d 872, held that displaced residents of a redevelopment area (claiming inadequacy of relocation plans) do not have legal standing to enjoin a local redevelopment agency, pointing out that the provisions of Section 1455(c) are but one of many obligations imposed upon the local agency by the United States as a condition for the granting of federal redevelopment funds and loans; that Congress has delegated to the Secretary the duty of enforcing the contracts and that those not party to the contract have no standing to enforce conditions imposed on redevelopment agencies by the United States.

The Court is also mindful, however, that since the decision of that case, the Housing Act has been amended in significant respects in 1965 and 1966, as already above noted, to make much more clear the Congressional intent to protect the interest of residents about to be displaced by a redevelopment agency and its further intent to impose upon the Secretary an added positive duty of requiring satisfactory assurance that the contractual obligations of the local agency concerning the availability of relocation housing, within the meaning of Section 1455(c)(1), are actually being complied with by the local agency.

Further, since 1963 the Supreme Court has significantly broadened the concept of standing to sue. For example, in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) the Supreme Court, modifying the long standing rule of Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), has recognized the standing of persons, whose interest is only that of taxpayer, to sue when constitutionality of federal action is involved.

■■ In the present case the standing of plaintiffs is not dependent on mere taxpayer status. It arises out of a manifest intent of the Congress to protect the interests of a particular class—individuals and families about to be displaced by the urban renewal project. In the recent case of Hardin v. Kentucky Utilities Co., 390 U.S. 1, 5–7, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968) the Supreme Court, dealing with the Tennessee Valley Authority Act, has made clear that, when a statute clearly reflects a Congressional purpose to protect the interests of a particular class, persons within that class have standing to require compliance with the statute. The Court rejected the holding of Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924 (1955), relied on by defendants in the present case.

Recent amendments to the Act and the broadening trend of the Supreme Court are reflected in later federal cases dealing with standing to sue under the Housing Act.

In Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968), a class action brought by residents of an urban renewal area (about to be displaced by the renewal project) against both the local and the federal agencies to restrain demolition of residences until the residents could be relocated in safe, decent houses at rentals they could afford to pay, the Court of Appeals, reversing a District Court dismissal for lack of standing and upon an extensive review of the Housing Act and the cases (including Johnson, supra, which it declined to follow) held (pp. 932–936) that plaintiffs had legal standing to raise the issue that there had been a violation of statutory provisions requiring that contracts must provide a feasible method for relocation, saying:

" * * * As we have already said, the fact that Congress intended to protect the specific interests of displacees when it enacted the, section is enough to give the displacees standing, in the absence of a persuasive reason to believe that Congress intended to cut off judicial review. * * * The possibility that an administrative agency, charged with enforcing a requirement established by Congress in the public interest, will not adequately perform the task is equally great whether enforcement is through contract or through direct regulation. Accordingly, the reasons for allowing those who have a direct, personal interest in furthering the Congressional purpose to seek judicial review of administrative action are as compelling in one situation as in the other."

In Powelton Civic Home Owners Ass'n v. Department of Housing and Urban Development, 284 F.Supp. 809 (E.D.Pa. 1968) the Civic Association and residents of an urban renewal area brought an action against the Secretary to enjoin disbursal of federal funds to the local redevelopment agency on the ground of absence of adequate relocation. The Court recognized the judicial reviewability of the Secretary's procedures under the Housing Act and also the standing of displaced residents to sue. On the subject of standing (pp. 820–828) the Court, upon a review of the cases, (including Johnson, supra) succinctly states its conclusion:

"The plaintiff's economic interest in adequate relocation is obvious and beyond dispute. The provisions of the Housing Act recognize and seek to protect that interest. The Secretary of HUD has allegedly acted in disregard of the plaintiff's recognized and protected interest. 'When a party seeks judicial relief from an injury inflicted by administrative action upon an interest recognized by statute, standing and review traditionally obtain.' * * * The plaintiffs' theory of relief fits the traditional formula. Particularly where, as here, the gravamen of the plaintiffs' complaint is that the Secretary has failed to provide implicitly required procedural machinery, the court should not abandon its institutional responsibility for assuring the procedural due process of agency actions. In the absence of an explicit congressional mandate, we believe it inappropriate to abdicate that responsibility in this case. * * * We have concluded that the relocation provisions of 42 U.S.C. § 1455(c) (1) and (2), both in their substantive and in their procedural implications, are intended for the protection of these particular plaintiffs and do provide standing in this case." [5]

5. See for a review of the cases developing the law concerning judicial review and standing to sue—as applied to urban renewal, dislocation, and relocation, and similar situations, "Judicial Review of Displacee Relocation in Urban Renewal," Yale Law Journal, Vol. 77 p. 966 (1968); "Protecting the Standing of Review of Site Families," Yale Law Journal, Vol. 73, pp. 1080–84 (1964); "The Place and Function of Judicial Review in the Administrative Process," Fordham Law Rev. Vol. 28, pp. 1, 12 (1959); "Standing—Taxpayers and Others," Professor Kenneth Culp Davis in University of Chicago Law Review, Vol. 35, No. 4, pp. 622, 625.

Because *Johnson,* supra, was decided under an earlier form of the Housing Act and in the context of narrower concepts of judicial review and standing to sue, we conclude that *Johnson* is distinguishable and inapplicable and that plaintiffs have standing to sue to obtain judicial review for the protection of their interests as specifically recognized in the Housing Act.

## WORKABLE PROGRAM FOR COMMUNITY IMPROVEMENT—INTERPRETATION OF SECTION 1451(c).

So much for relocation. We now consider plaintiffs' allegation that there is now no certification of a San Francisco "workable program of community development" as required by Section 1451(c).

■ Section 1451(c) deals with the certification by the Secretary of a "workable program of community improvement." This section provides in substance and effect that no contract for loans or grants shall be entered into and no mortgage shall be insured under Title 12, §§ 1715*l*(d) (3) or 1715k unless these is presented a "workable program for community improvement," which shall include among other things, a plan for effectively dealing with slums and blight areas within the community and the establishment and preservation of a well planned community with well organized residential neighborhoods of decent homes and suitable living environment for adequate family life, and the Secretary determines and certifies that such program meets the requirements of § 1451(c).

This Section 1451(c) (unlike Section 1455(c) (1), (2)) requires the Secretary to make, as a condition of entering into contracts or insuring mortgages, a determination that this "workable program for community improvement" meets the requirements of Section 1451(c), above summarized, and to certify that federal assistance may be made available in the particular community.

This so-called "workable program" applies, not to any particular project, but to the City of San Francisco as a whole community in order to render it eligible for federal funds and loans for any project undertaken within the city for which federal aid is authorized by the Housing Act.

The specifications for a "workable program" do not specifically mention relocation as does Section 1455(c). The specifications are, however, quite broad.

Plaintiffs' complaint is directed to the point that the Secretary's certification of the San Francisco program expired by its terms on June 30, 1967, and that "as a result thereof there is no workable program for community improvement in effect at this time." (See Count II of Complaint, Par. VII and Par. III).

However, as defendants point out, the original certification of the San Francisco program, which expired on June 30, 1967, contained a proviso that its expiration date would not affect renewal projects in the locality with respect to which a loan and grant had been executed prior to the expiration date. Such was the case with respect to this Western Addition project. The original certification, therefore, remained in full effect as to this particular project. (See Def. Ex. 19). In any event, a further certification of San Francisco's "workable program for community improvement" was issued on May 21, 1968 and is now in effect with an expiration date of June 1, 1969. (See Def. Ex. 20).

We conclude, therefore, that no material issue is tendered by the allegations of Count II that no certified "workable program" is in effect in San Francisco.

It should be noted, however, that the Secretary regards this "workable program" certification provision of Section 1451(c) as broad enough to include a requirement that the City and County of San Francisco provide a satisfactory relocation plan. In the Regional Administrator's letter of July 29, 1968, already discussed, he states that even if the "satisfactory assurance" provision of Section 1455(c) (2) is not applicable to

Western Addition II "* * * the Department could, in the event of any violation of Section 1455(c) (1)" (i. e., non-performance of the local agency's relocation obligations) "have resort to the Loan and Grant provisions" (i. e., the certification provision of Section 1451(c) as a condition for making grants or loans or mortgages under Section 1715k and Section 1715*l*(d) of Title 12).

Under such a construction of Section 1451(c), the failure of the local agency to submit satisfactory assurance that adequate relocation housing is available for displacees would be ground for refusing further certification of San Francisco's "workable program."

We do not consider it necessary at this point to determine whether absence of available relocation housing in San Francisco should or could be ground for revoking or refusal to renew existing certification of San Francisco's "workable program of community development"— even though the Secretary seems to concede that he could resort to such a remedy if the local agency attempts to enforce displacements from Western Addition II without available relocation facilities.

On this point the Court merely reserves power to further review the Secretary's future proceedings and to make such further orders as may be proper.

This Memorandum of Decision shall constitute the findings of fact and conclusions of law required by Rule 52(a) Federal Rules of Civil Procedure.

Plaintiffs and defendants are directed to jointly prepare and submit to the Court within five (5) days a formal preliminary injunction which will reflect the views of the Court set forth herein.

The Court concludes that in this case no security should be required as otherwise provided in Rule 65(c), F.R.Civ.P. See: Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D.Cal.1965); Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810, 815 (6th Cir. 1954); United States v. Onan, 190 F.2d 1 (8th Cir. 1951); and Swift v. Black Panther Oil & Gas Co., 244 F. 20, 30 (8th Cir. 1917).