**Ed ARRINGTON et al., Plaintiffs-Appellants,**

v.

**The CITY OF FAIRFIELD, ALABAMA et al., Defendants-Appellees.**

**No. 26781.**

United States Court of Appeals Fifth Circuit.

Aug. 7, 1969.

Demetrius C. Newton, Birmingham, Ala., Charles H. Jones, Jr., Cambridge, Mass., Michael Davidson, Jonathan Shapiro, Jack Greenberg, New York City, for appellants.

Frank B. Parsons, City Atty., Fairfield, Ala., J. Clewis Trucks, Fairfield,

Ala., for appellees Fairfield, Alabama Housing Authority, Mrs. Wilma Andrews, in her capacity as Director, and C. J. Donald.

Kenneth Perrine, Birmingham, Ala., Leader, Tenenbaum, Perrine & Swedlaw, for Engel Realty Co.

James W. May, Corretti, Newsom, Rogers & May, Douglas P. Corretti, Birmingham, Ala., as amicus curiae of Birmingham Bd. of Realtors, Inc.

Before COLEMAN and GODBOLD, Circuit Judges, and SCOTT, District Judge.

SCOTT, District Judge:

This is a class action in equity by Negro residents of the Englewood section of Fairfield, Alabama, seeking an injunction to prohibit the City of Fairfield and Engel Realty Company from displacing them from their residences and their consequent removal from the City of Fairfield in the absence of adequate relocation housing in the City of Fairfield. Plaintiffs' complaint was dismissed by the District Court for the Northern District of Alabama. We hold that the District Court was in error, and remand for further proceedings consistent with this opinion.

The complaint is founded upon Title 28, U.S.C. § 1343(3) and (4), Title 42 U.S.C. §§ 1981, 1982, 1983, 1988 and the Thirteenth and Fourteenth Amendments to the United States Constitution. Plaintiffs-appellants also seek preliminary and permanent injunctions to "restrain defendants from continuing their present course of conduct, policies, practices, custom and usage of providing municipal facilities on a discriminatory basis and from pursuing an urban renewal program in such a way as will cause the involuntary relocation of plaintiffs and members of their class, without providing for suitable relocation within the City of Fairfield, and from making relocation outside the City inevitable by zone changes which foreclose adequate residential redevelopment".

The primary defendants in the action are the City of Fairfield and Engel Realty Company, a private company with which the City of Fairfield contracted to commercially develop the Englewood area. Other defendants named in the complaint are various city officials and agencies who have acted in the name of the City and the commissioner of the Fairfield Housing Authority.

In their complaint, filed on July 11, 1968, plaintiffs sought to preliminarily and permanently enjoin the City of Fairfield and others from proceeding with the condemnation, acquisition or demolition of properties in Englewood. Without answering, all defendants moved to dismiss for failure to state a claim, and then moved for summary judgment. A hearing on plaintiffs' motion for a temporary injunction to enjoin displacement pending a final hearing was held on August 9, 1968, and at the conclusion of the hearing the District Court denied plaintiffs' motion. The Court entered judgment on August 13, 1968, granting the defendants' motion to dismiss and motion for summary judgment.

Plaintiffs filed notice of appeal on August 22, 1968, and on September 16, 1968, moved for an injunction pending appeal. A panel of this Court granted the motion for the injunction pending appeal on October 10, 1968. This injunction was vacated on February 17, 1969. by the present panel.

The plaintiffs live in Englewood, a predominantly Negro section of Fairfield. As found by the court below, most of the buildings are structurally defective and do not meet the health standards of the City of Fairfield. The streets are inadequate and unpaved and an open drainage ditch runs through the entire area. Furthermore, the majority of the plaintiffs are tenants.

In 1964 an interstate highway was proposed for building through portions of Englewood. To comply with state law, the City of Fairfield rezoned Englewood from predominantly residential to tourist and commercial.

During 1966 and 1967 the Fairfield Housing Authority and the regional office of the Department of Housing and Urban Development (HUD) discussed informal proposals for an urban renewal program in Englewood, which qualified as a "slum" area. The project was to displace 161 families of whom 150 were Negroes.

Before it was notified of the outcome of its request for federal urban renewal funds, the City of Fairfield decided to proceed with the commercial development of Englewood. The mayor met with owners of the property and Engel Realty Company, agent for the owners, to determine the feasibility of building a motel near the interstate highway in order to promote tourist business in the City. In furtherance of its plan, the City adopted the following resolution:

"BE IT RESOLVED by the City Council of the City of Fairfield that the Mayor be and hereby is authorized to enter into a contract with Engel Realty Company in consideration of Engel Realty Company's completion of a commercial development in the Englewood area of the City of Fairfield, the City of Fairfield will install drainage pipe in and cover the drainage ditch in that area commonly known as 'tar ditch' and that the City of Fairfield will complete such work prior to the completion of the site preparation for the proposed development by the Engel Realty Company.

"Adopted 4th day of December, 1967.
"Approved 5th day of December, 1967."

In dismissing the plaintiffs' claim, the District Court made the following findings of fact:

"1. That the plaintiffs were not property owners in Englewood; it concluded that, as such, they had no standing to invoke the jurisdiction of the court;

"2. That there was no urban renewal program under submission, as provided by 42 U.S.C. Section 1451,

and that the City had no intention of trying to renew the project;

"3. That the property involved was "blighted" and 90% of the buildings were structurally defective and subject to being condemned for health reasons;

"4. The property was not being condemned by the City or Housing Authority under the power of eminent domain;

"5. That Engel Realty did attempt to purchase the property for the purpose of building a motel and other commercial enterprises, but that it was not acting as an agent for the City, Housing Authority, or any other defendant in its attempt to purchase the property; and

"6. That Engel Realty did not participate in the city's urban renewal program."

The trial court concluded that the plaintiffs as tenants had no interest in the property or in the contracts regarding the property and, therefore, had no right to invoke the jurisdiction of the federal court. The Court further stated that the director of the Housing Authority, clerk of the City, members of the City Council and planning committee and the mayor of the City were not proper party defendants.

Initially, it is important to recognize the narrow issues on this appeal. A determination of the merits is not before us. This Court is not involved with fact issues. The District Court heard oral testimony on motions to dismiss and for summary judgment and then dismissed the case for lack of standing and for failure to state a claim upon which relief may be granted. The fact issues of discrimination and displacement have not been determined by the District Court. If there is standing and a good claim for relief is alleged, the case should be tried in the District Court. The forming of an equitable remedy in the first instance is for the sound discretion of the trial judge.

## STANDING TO SUE

Appellants assert that as impoverished Negro tenants of the Englewood area of Fairfield they have standing to claim that displacement from their residences precipitated by state action and in the absence of relocation housing within the City, will deny them rights secured by the Thirteenth and Fourteenth Amendments and Acts of Congress which enforce these rights.

The District Court never reached the merits of the claim because it concluded that the "plaintiffs having no interest in the property or interest in contracts regarding the same, have no right to invoke the jurisdiction of this Court." In its findings of fact the District Court stated: "There is no evidence before the Court disclosing the true owners of said property described in the complaint and it does not appear that any party owning said property is now before the Court."[1]

The District Court attached significance to the fact that appellants are tenants and are not property owners. What appellants seek to protect, however, is their right to reside in the City by owning or *renting* housing. The crux of their claim is not deprivation of property without due process [i.e., the "property right" of a lessee or tenant], but violation of equal protection.

■ In order to have standing to assert that a state has denied plaintiff his constitutional rights, a plaintiff is required to show "a personal stake in the outcome of the controversy". Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1961). He must be adversely affected to a judicially cognizable degree by the government action he seeks to challenge. See, generally, Davis, Standing: Taxpayers and Others, 35 U. Chi.L.Rev. 601 (1968). Here plaintiffs' stake in the outcome of the case is immediate and personal and they stand to suffer economic injury if they lose. The right which they allege has been vio-

lated; namely, the right not to be subjected to racial discrimination by state action, is one which falls within a constitutionally protected area. Cf. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S. Ct. 2186, 20 L.Ed.2d 1189 (1968).

■ If the plaintiffs' allegations are correct, the adverse effects on them would be "immediate and personal". See Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 927 (2d Cir. 1968). Under *Norwalk*, urban renewal project residents have standing to allege that a plan that forces them out of the city in which they were residing deprives them of equal protection of the laws. Plaintiffs' "stake" in this case is their [alleged] displacement from the community with the resulting personal, economic and social dislocation. Whether plaintiffs can prove displacement is for the trial court to determine.

■ As the Supreme Court made clear in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the "standing" doctrine focuses on the seeking of adjudication by a party and not on the issues he wishes to have adjudicated. The Court pointed out that in deciding the question of standing, it is not relevant that the substantive issues in the litigation might be nonjusticiable. In *Flast* the Court held that a federal taxpayer had standing to challenge unconstitutional taxing and spending programs if the taxpayer demonstrated the necessary stake in the outcome of the litigation to satisfy Article III of the Constitution, i. e., the taxpayer must establish a link between his status as a taxpayer and the enactment attacked, and he "must establish a nexus between that status and the precise nature of the constitutional infringement alleged." *Flast, supra,* at 102, 88 S.Ct. at 1954.

The sole case relied on by the court below in support of its denial of standing was Johnson v. Redevelopment Agency of the City of Oakland, 317 F.2d 872

---

1. The complaint describes the Negro residents of Englewood as both renters and owners. However, for the purposes of this appeal, appellants concede that they are tenants. Brief for Appellants, p. 15.

(9th Cir. 1963), cert. denied 375 U.S. 915, 84 S.Ct. 216, 11 L.Ed.2d 154 (1963), a case in which standing was denied residents of a federally assisted urban renewal project who were challenging a failure to comply with the requirements of a federal urban renewal law. *Johnson* is not apposite to the present case. In *Johnson* the appellate court dealt only with standing under the Housing Act of 1949. *Johnson,* at 874. In the case *sub judice,* standing to assert a deprivation of equal protection of the laws is claimed. *Johnson* has been rejected in subsequent decisions. See *Norwalk, supra;* Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 442 (N.D. Cal.1968); Powelton Civil Home Owners Ass'n v. Dept. of Housing and Urban Dev., 284 F.Supp. 809 (E.D.Pa.1968).

Similarly, the concept of standing has been broadened to allow organizations and individuals representing "the community" to claim that the routing of a highway discriminates against Negroes by destroying a Negro business community, injuring Negro educational institutions and otherwise harming a Negro community. Nashville I–40 Steering Comm. v. Ellington, 387 F.2d 179 (6th Cir. 1967), cert. denied 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968).

We hold that the Negro residents of the Englewood area of Fairfield have standing to bring this action. Since plaintiffs have standing, we must decide whether the District Court erred in granting defendants' motions to dismiss and for summary judgment.

### EQUAL PROTECTION

■ The court below considered matters outside the pleadings; therefore, the motion must be treated as a motion for summary judgment. Rule 12(b), Federal Rules of Civil Procedure. See Dinwiddie v. Brown, 230 F.2d 465 (5th Cir. 1956), cert. denied 351 U.S. 971, 76 S.Ct. 1041, 100 L.Ed. 1490 (1956).

■ Under Federal Rule of Civil Procedure 56(c), 28 U.S.C.A., a motion for summary judgment is proper if the pleadings, admissions, affidavits, etc., show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Rule 56 should be invoked cautiously in order to allow a full trial where there is bona fide dispute of facts. The law is well settled that in order to entitle the moving party to summary judgment as a matter of law, it must be quite clear "what the truth is". National Screen Service Corp. v. Poster Exchange, Inc., 305 F.2d 647 (5th Cir. 1962). The court's duty is not to decide factual issues on summary judgment, but only to determine whether there are factual issues to be tried. Slagle v. United States, 228 F.2d 673 (5th Cir. 1956).

■ Unlike many summary judgment actions, the District Court in this instance held a hearing and heard testimony. Plaintiffs moved for a continuance of that hearing which was denied. The trial court's disposal of the issues on summary judgment has resulted in an incomplete record. However, from that hearing, it is clear that the City of Fairfield was involved in the financing and promotion of the redevelopment project in Englewood. Although there is no evidence at this stage that Engle Realty has an agreement or contract to purchase the property from the property owners or that plaintiffs, if displaced, would have to move outside Fairfield, plaintiffs may be able to show that the City will knowingly and actively precipitate the dislocation of persons who, because of a city-wide practice of residential discrimination, will have no place to go. Exclusion by physical displacement resulting from public discrimination is no less objectionable than such exclusion by rezoning. Cf. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). Where there is state involvement, the fact that the decision to discriminate may be made by private individual rather than a public official is not decisive. See Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Shelley v. Kraemer,

334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Cf. Jones v. Alfred H. Mayer Co., *supra*. Under the unique circumstances of this case the City may involve itself in the discriminatory operation of the private housing market. The City acknowledges that installing storm sewers and covering the "tar ditch" is a substantial project.[2]

 There is little doubt that state action is present. Cf. Shelly v. Kraemer, supra, 334 U.S. at 12, 68 S.Ct. 836 (dictum); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Smith v. Allwright, 321 U.S. 649, 664, 64 S.Ct. 757, 88 L.Ed. 987, 996, 151 A.L.R. 1110 (1943); Home Tel. & Tel. Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913). The issue for the trial court to determine is whether that state action is constitutional. The equal protection clause of the Fourteenth Amendment prohibits state descriminatory action of every kind, including state participation through any arrangement, management, funds or property. Cooper v. Aaron, 358 U.S. 1, 4, 78 S.Ct. 1401, 1403, 3 L.Ed.2d 5, 9 (1958). Private conduct abridging individual rights does not violate the Amendment unless to some significant extent the state in any of its manifestations has become involved in it. Burton v. Wilmington Parking Authority, 365 U. S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the state in private conduct be attributed its true significance." *Burton, Id.*

### PROPER PARTIES

The District Court held that the executive director of the Housing Authority, the members of the City Council, the members of the Planning Commission and C. J. Donald are not proper parties.

The Court implied that the Fairfield Housing Authority and the mayor of Fairfield were also not proper parties.[3]

 Rule 20, Federal Rules of Civil Procedure, allows a plaintiff to join as a party one who has some relation to the action where that relation is not so close as to categorize him as a necessary or indispensable party. The provisions for permissive joinder under Rule 20 are very broad and the court is given discretion to decide the scope of the civil action and to make such orders as will prevent delay or prejudice. See Wright, The Law of Federal Court, 264 (1963). Upon remand, the District Court should again review the question of parties under the evidence and law as it is then developed. Upon the present state of the record this Court cannot say that these parties are not proper parties.

Appellants urge this Court to reverse the District Court's denial of the motion for a preliminary injunction in the event that this Court agrees with appellants' contentions regarding their standing and claim against which relief may be granted. However, on the basis of the record before us and the further proceedings to be held in the District Court, we will leave that question open for the District Judge.

Appellants would have us incorporate the regulations and policy directives of the United States Department of Housing and Urban Development, Title VI, into the Thirteenth and Fourteenth Amendments as minimum standards in this housing problem. We need not cross this threshold of constitutional law. The District Court erred in granting defendants' motions to dismiss and for summary judgment. Defendants should be required to file answers and the parties allowed to undertake discovery pursuant to the Federal Rules of Civil Procedure. We, therefore, remand this case to the

2. See the City's motion to dissolve the temporary injunction pending the determination of the case.

3. See original record, p. 110; findings of fact and conclusions of law, p. 690.

The District Court also held that the City clerk was not a proper party. No reversal of this holding is sought.

District Court for proceedings consistent with this opinion.

Reversed and remanded.

COLEMAN, Circuit Judge (dissenting):

This case, in my opinion, does not present a federal question. With deference to the views of my highly respected Colleagues, the effect of their decision is to convert the federal courts into local drainage ditch supervisors.

The truth of the controversy is plain and unmistakable. I seek no justification for straining over whether the District Judge did or did not, should or should not have, acted under Rule 12(b) or Rule 56, F.R.Civ.P. This is of no real significance, for the dismissal was eminently correct in any event.

The Court heard testimony of witnesses, but this was at the request of the plaintiffs, evidently as a substitute for counter-affidavits. Even so, this proof gave the plaintiffs no comfort and it produced no factual dispute. In his order dismissing the suit Judge Allgood wrote: "There is no conflict in the evidence presented to the Court and no general issue of material fact. Upon the pleadings now before the Court, together with the affidavits, exhibits, and testimony of the witnesses there is no cause of action * * * nor from the facts presented could the plaintiffs set forth a claim upon which relief may be granted".

In my opinion, he was right either way and both ways. A remand will not develop any additional material facts.

If we assume that plaintiffs had standing to sue and that all named defendants were proper parties, the result should be the same. I would therefore attach no importance to these procedural niceties but would dispose of this case as law and justice require, § 2106, Title 28 U.S.C.A. To fail to do so is to inflict serious damage upon parties against whom no federal cause of action is, or could be, shown.

Although the improvements visualized for this slum area were to be done by private individuals, using no public funds, with no exercise of eminent domain, the majority of the panel thinks a case is or might be presented. Yet, they decline to decide the only real issue raised by the plaintiff—a fervid contention, both below and on appeal, that even as between private parties the regulations and policies of the United States Department of Housing and Urban Development with reference to persons displaced by publicly sponsored urban renewal are the minimum standards for the determination of Thirteenth and Fourteenth Amendment rights *in the area of "race and housing"* (emphasis mine). It is secondarily argued that in any event the removal of plaintiffs at the termination of their lawful right to occupy the property would violate the same rights.

I, too, would not decide these issues in this case—but for a different reason. The facts, viewed in the light most favorable to the plaintiffs simply do not present a substantial federal question.

For nearly two years, in the midst of wildly escalating construction costs and interest rates, these plaintiff-appellants have blocked the proposed construction of a Holiday Inn on new Interstate Highway 59 in the northeast corner of Fairfield, Alabama, immediately adjacent to the common boundary between Fairfield and Birmingham. Yet, the undisputed fact is that on August 9, 1968 sixty-five to seventy per cent of the buildings in the area involved were vacant and there were not "two buildings in the area fit for human occupancy". In their brief the plaintiff-appellants refer to the area as "a slum by any common definition of the term". Plaintiffs agree that "90% of the buildings are structurally defective and do not meet the health standards of the City of Fairfield and the buildings are subject to being condemned for health reasons". The streets are not paved. Community facilities are lacking, and a drainage ditch runs through the entire area. The majority of the residents are tenants and 94% of them are of the black race. In 1964, due to the proposed construction of a new Interstate

Highway the City rezoned the area from residential to residential-commercial. So far as the record shows this action was not then attacked, administratively or judicially.

In June, 1967, the Fairfield Housing Authority initiated an urban renewal project in the Englewood area of the City of Fairfield. The affidavit of the Assistant Administrator for Renewal Assistance, Region III, United States Department of Housing and Urban Development (HUD), shows that in the entire area (considerably larger than that involved in this suit) the project would have involved 137 residential structures, of which 87% were classified as substandard. This federal official deposed that it was a slum area and would qualify for federal urban renewal assistance. The Housing Authority for Fairfield, Alabama, was never able to obtain approval for this urban renewal project. From letters received and conferences held it was plainly apparent by midsummer of 1967 that there was not going to be any project. The project was dead, but it was not *formally* "pronounced dead" until the Assistant Administrator put it in a letter dated February 8, 1968. In his deposition, the Assistant Administrator of HUD stated,

"I therefore concluded that adequate relocation resources were not available to relocate all families and individuals living in the project area and that neither the City nor the Housing Authority planned to build replacement housing in the City of Fairfield for Negroes displaced by the proposed Englewood Urban Renewal Project. My office therefore concluded that the Department of Housing and Urban Development could not continue to process the application of the Fairfield, Alabama Housing Authority and it was returned to the Housing Authority under cover of my letter of February 8, 1968".

The cover letter, attached as Exhibit A to the deposition, stated, "Although a sincere effort has been made by all concerned and several alternatives have been considered, the basic problems still exist". HUD delivered the *coup de grace* on February 8 but this suit was not filed until October 2. It is thus demonstrated beyond cavil that the urban renewal project had expired, never to rise again, eight months before this suit was brought. The urban renewal project had no relevance to the merits of this case. It was undoubtedly a closed chapter when private parties decided to see what they could do with private funds toward clearing and improving a part of the area formerly included in the dead project.

When it became generally known that the requirements of HUD could not be met and that the urban renewal project was doomed, Engel Realty Company, *a private enterprise,* decided to try to do something about it. It developed a plan by which it hoped with non-public funds to acquire and develop the area by voluntary purchases from the owners. This, of course, would have been subject to the rights of tenants to remain until the end of their respective terms of occupancy, unless Engel should also acquire those rights by private bargaining. Engel was acting in its own right and not as agent of any defendant in this case. Neither had Engel been involved in the ill-fated urban renewal project. No public money would be employed. Eminent domain could not be invoked.

Except for one detail the plan was totally disassociated from any public authority of any kind. Engel Realty thought that the best possible chance for acquiring the property and developing it at no loss to those assuming the risk would be to build a motel on it. A motel was out of the question unless the previously mentioned open drainage ditch could be covered. The cost of this was so high that Engel went to the City of Fairfield and on December 4, 1967, obtained the written agreement of the authorities that if a motel could be built the City would cover the drainage ditch, hoping that tax revenues from the new construction would amortize the expense.

The agreement of the City of Fairfield to do that which it clearly had the au-

thority to do (regardless of whether a motel was or was not built) furnished the starved shadow of the federal question which is sought to be raised in this case.

The owners of the property in Fairfield are under no compulsion to sell their property. They cannot be placed under compulsion. The tenants will not have to leave until their terms expire. This they could be required to do regardless of whether a motel is built. They are living in buildings not fit for human habitation, subject to condemnation. Yet, the federal courts are now being used to perpetuate this impossible situation. Still worse, they are being used to circumvent an economically feasible revitalization of the blighted area.

With deference to my Colleagues, I must say that this case offers the slimmest support I have ever seen for federal intervention in a purely local matter (at the Board of Aldermen level).

Putting this cover on an open drainage ditch is a municipal function and a progressive step in any heavily populated area, regardless of its racial composition. Covering this drainage ditch cannot possibly have any compulsive effect on anybody. It will not force any owner to sell his property to anybody. It will not control the price which he may demand and collect, if he wishes to sell at all. It will not shorten the term for which any tenant has contracted. It will lead to progress, to new buildings, and to new economic opportunities—a legitimate object anywhere. Before today I had not thought that where no public funds or public compulsion is involved the Constitution requires that a tenant, even if of a minority race, may at his option remain on rented premises beyond the expiration of his term and may enforce that option in the federal courts.

If a case is to require decision as having raised a substantial federal question the Constitution of the United States, a treaty, or a federal statute must somewhere be applicable or at least in issue. This case cannot square with that standard. Voluntary purchases and sales of private property between willing sellers and willing buyers, when no federally guaranteed privilege or immunity is denied, and when neither party has any thought of attempting to compel a citizen to do something he has a right to refuse to do, are not prohibited or inhibited by the Constitution or laws of the United States. "Sifting facts and weighing circumstances" of the actions and relationships here involved, Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) there is no discriminatory state action in this case.

So, in addition to what I said in the beginning about becoming local drainage ditch supervisors, this decision has another far-reaching potential: If a racial argument can be thought of, and that is not hard to do, the federal courts are now set to intervene in any quarrel arising out of private slum clearance and rehabilitation, right down to the least detail.

The Judgment of the District Court ought to be affirmed, so I respectfully dissent.