Maurice **SHANNON** et al.

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; George Romney, Secretary of Department of Housing and Urban Development; Warren P. Phelan, Regional Administrator, Region II, Department of Housing and Urban Development; and Thomas J. Gallagher, Regional Administrator, Federal Housing Administration, Department of Housing and Urban Development.**

Civ. A. No. 69–197.

United States District Court
E. D. Pennsylvania.

Oct. 7, 1969.

Edwin D. Wolf, Philadelphia, Pa., for plaintiffs, Michael Churchill, Stephens Clay, Robert B. Wolf, Philadelphia, Pa., of counsel.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., Merna B. Marshall, Asst. U. S. Atty., for defendants.

Arsen Kashkashian, Jr., Milton C. Sharp, Philadelphia, Pa., for Redevelopment Authority.

## OPINION

JOSEPH S. LORD, III, District Judge.

This class action is brought pursuant to Title I of the Housing Act of 1949, as amended, 42 U.S.C.A. § 1441 et seq. (Supp.1969), (hereinafter cited as "Housing Act"), and the Demonstration Cities and Metropolitan Development Act, 42 U.S.C.A. § 3301 et seq. (Supp. 1969), (hereinafter cited as "Model Cities Act), by white and black residents, businessmen, and representatives of pri-

vate civic organizations in the East Poplar Urban Renewal Area of Philadelphia. The individual defendants are those federal officials responsible for implementing the national housing policy under the Housing Act and the Model Cities Act. Plaintiffs initially requested a preliminary injunction against further insurance or the approval of further insurance of advances by the lending institution of construction funds for Fairmount Manor, an apartment project financed under the 221(d) (3) program for rent subsidy under the Housing and Urban Development Act of 1965, 12 U.S.C.A. § 1715*l*(d) (3) (Supp.1969), and qualified for a rent supplement housing program under that Act (12 U.S.C.A. § 1701s (Supp.1969).

Fairmount Manor occupies the blocks between 6th & 7th Streets and Fairmount Avenue & Green Street within the East Poplar Urban Renewal Area, which is in turn bounded by Spring Garden Street & Girard Avenue, and by 5th & 9th Streets in Philadelphia. East Poplar is subject to an Urban Renewal Plan ("The Plan") approved by Philadelphia's City Council on December 24, 1959, and amended several times thereafter. Federal funds were made available to the Philadelphia Redevelopment Authority ("LPA") for the renewal of East Poplar under the terms of a loan and grant contract between the Department of Housing and Urban Development ("HUD") and the LPA. Plaintiffs' Exhibit 70 (hereinafter cited as "P.Ex.").

Plaintiffs' request for a preliminary injunction was denied by us on February 5, 1969, because we could find no irreparable harm to the plaintiffs if the injunction did not issue, and we could not then determine that the plaintiffs were likely to succeed on the merits of their complaint. Because of the importance to the public of the issues involved and the urgency to the plaintiffs of a decision on the merits, we heard argument on the defendants' motion to dismiss the complaint as soon as the parties were prepared. On February 17, 1969, we issued an order denying the motion.

Subsequently, after several days of testimony, the parties agreed to a settlement of the preliminary issue then facing the court, namely, whether the plaintiffs were, in fact entitled to the procedural opportunity granted in Powelton Civic Home Owners Ass'n v. Department of Housing & Urban Dev., 284 F.Supp. 809 (E.D.Pa., 1968). Under the terms of their settlement, HUD agreed to consider certain documentation in support of plaintiffs' position. On April 14, 1969, after consideration of the plaintiffs' proffered data and memoranda, HUD affirmed its earlier decision to permit the erection of Fairmount Manor.

Not unexpectedly dissatisfied with this result, the plaintiffs returned to us seeking review of HUD's decision, a possibility foreseen by the parties who had agreed that the court should retain jurisdiction over the case during HUD's deliberations. Plaintiffs adduced over a week's testimony, and now attack the Secretary's decision to approve Fairmount Manor on several grounds. Before considering them, however, it is necessary to explain at some length our reasons for denying the government's first motion to dismiss the suit, treating the issue of standing now, and deferring discussion of reviewability to our decision on the second motion to dismiss.

## I.

## FIRST MOTION TO DISMISS

### a. *Background*

In their complaint, plaintiffs alleged that: pursuant to the original Plan for East Poplar, the LPA contracted with Abram Singer Sons, Inc., ("Singer") to erect 244 single family dwellings and to rehabilitate existing buildings. Relying on those facts, and representations made by Singer and the LPA, some of the plaintiffs made substantial investments, including the purchase of homes in East Poplar. However, from 1961 until the present time, only seventy-two of the 244 single family units have been constructed. In April, 1966, rehabilitation of the houses ceased, and houses on the

Fairmount Manor site were demolished in lieu of rehabilitation. Singer proposed the substitution of a one-and-two-bedroom apartment project with subsidized rentals for the originally planned single family dwellings. This project received approval from the LPA and the Philadelphia City Council as well as federal funding. Construction began on January 3, 1969.

Finally, plaintiffs alleged that since the adoption of the original Plan, East Poplar has become a low-rent subsidy community contrary to the Plan's original purpose, to wit: only ninety privately-owned single family dwellings presently exist; East Poplar already has within its borders a 203-unit public housing project, and adjacent to East Poplar are two public housing projects of 1324 and 372 units; these three projects comprise 13% of all existing public housing projects in the entire City of Philadelphia. Plaintiffs further alleged that the apartment project would have a markedly deleterious impact upon the already precarious racial and socio-economic balance of the East Poplar community surrounding Fairmount Manor.

We read plaintiffs' complaint to assert their standing to challenge the adequacy of the procedures used by HUD and the LPA to change significantly the Plan of development for East Poplar. Plaintiffs initially alleged two procedural wrongs: first, that the Philadelphia City Council did not, and HUD had not required it to hold a public hearing on the question whether the allegedly significant change in the original Plan represented by Fairmount Manor should be approved; and second, that the Secretary of HUD (including his designate) refused to afford them a "procedural opportunity" as provided in Powelton Civic Home Owners Ass'n v. Department of Home & Urban Dev., 284 F.Supp. 809 (E.D.Pa., 1968), to show why the Plan's amendment should not be approved.

Their crucial allegation, as we viewed their complaint, was that, in effect, no adequate public hearing, as provided in § 105(d), 42 U.S.C.A. § 1455(d) (Supp. 1969), was held on the allegedly significant change in the Plan, and that the change was accomplished in an unfair and unauthorized manner. Plaintiffs then brought suit challenging the Secretary's approval of Fairmount Manor and requesting this court to order HUD to hear them, relying on *Powelton, supra.*

### b. *Standing*

In *Powelton* the court enjoined the disbursement or approval by federal authorities under the control of the Secretary of additional funds to an urban renewal project, in which condemnation proceedings were still incomplete, until the plaintiffs were given an opportunity to present to HUD evidence of the inadequacy of relocation facilities for the project's displacees. The defendants sought to distinguish *Powelton* by pointing out that the *Powelton* plaintiffs were given a procedural opportunity to vindicate a specific statutory right to be relocated in adequate housing, 42 U.S.C.A. § 1455(c) (2) (Supp.1969), while plaintiffs here seek to vindicate more general provisions of the Act. These provisions place upon the Secretary a duty to assist and encourage " * * * the development of well-planned, integrated residential neighborhoods, the development and redevelopment of communities * * *", 42 U.S.C.A. § 1441 (Supp.1969), and a duty to approve loan and grant contracts only when he determines that there exists a "workable program" providing "for the establishment and preservation of a well-planned community with well-organized residential neighborhoods of decent homes and suitable living environment for adequate family life." 42 U.S.C.A. § 1451(c) (Supp.1969).

Defendants argued that the plaintiffs lacked standing to raise this issue because they did not possess the requisite directness of interest enjoyed by the plaintiffs in *Powelton* and the other relocation cases, since only those persons whose homes or property are taken for the project have any judicial standing. Since all such persons were removed from the tract in question by some time in

1962, no one, according to the defendants' argument, was left with standing to invoke the procedures contemplated by the Act.

This proposition we cannot accept.[1] While it may be true that in some respects the impact of the renewal project is less direct upon the present plaintiffs, who were not required to move, than upon those displaced, it cannot be gainsaid that the *future* impact of this plan more directly affects them. In determining whether these plaintiffs have the requisite directness of interest, the likelihood that the plaintiffs' interests will be adequately protected by the persons *directly* affected is a relevant consideration. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 154, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *see*, Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). It is apparent to us that any amendment to the Plan made after buildings on the tract were demolished could not possibly be as vital a concern to those already displaced as it is to these plaintiffs. The action complained of here—the Plan's amendment after relocation was completed—could only affect directly the people living in areas contiguous to the project area. The present plaintiffs—residents, businessmen, and owners of property in the immediate vicinity of Fairmount Manor —are those persons whose "living environment," 42 U.S.C.A. § 1451(c) (1) (Supp.1969), is directly affected by the challenged amendment of the Plan and, as such, they are the logical parties, in-

deed, the only presently available ones, to challenge the alleged departure from the procedural process assertedly required under the Act.

This view is buttressed by the plaintiffs' reliance on the alleged inadequacy of the public hearing held in March, 1968, to consider the approval of the present Fairmount Manor contract between the LPA and the developer and an amendment to the zoning ordinance applicable to Fairmount Manor. Plaintiffs argue that before the Plan could be significantly changed by any project, and before the Secretary or his designate could approve the change, they were entitled to be heard on such changes in the Plan as a matter of federal law.

Section 105(d), 42 U.S.C.A. § 1455(d) (Supp.1969), provides that all contracts entered into between the local public agency and HUD for federal loans and grants

"shall require that—* * *

(d) No land for any project to be assisted under this subchapter shall be acquired by the local public agency except after public hearing following notice of the date, time, place, and purpose of such hearing."

The legislative history of this section is illuminating. Section 105(d) was not contained in the initial version of the Housing Act reported out by the Senate Committee on Banking and Currency. It was an amendment proposed from the Senate floor by Senator Cain, who spoke the only reported words concerning this section.

---

**I.** To the extent that state notions of standing to challenge the condemnation proceedings underly these arguments, they are not apposite in determining whether these plaintiffs can seek redress in federal court of the alleged denial of federal procedural rights, both those which are expressly required by federal regulations and those which can fairly be implied from the Housing Act. We think that plaintiffs present a federal question cognizable in a federal court and that no doctrine of exhaustion of state remedies applies. Indeed, the alleged violations of federal law presented here may be of

no relevance to state courts. See, Bowker v. City of Worcester, 334 Mass. 422, 136 N.E.2d 208, 216 (Mass.1956). Furthermore, the law in Pensylvania apparently is that the only way to challenge the legality of an urban renewal project is in an action by the condemnee raising preliminary objections within thirty days after being served with notice of the condemnation. See, J. Krasnowiecki, Housing and Urban Development, 470–72 (1969). This procedure is clearly unavailable where the Plan is changed after condemnation and clearance of the tract.

"Mr. President, this amendment is designed to apply what some of us think is a very normal, healthy, completely American custom to the procedure to be followed in arriving at a local determination of any redevelopment or slum-clearance project. Under the amendment, before any authorized public agency could enter into a contract for financial aid, it must first have held public hearings on the proposed project, Mr. President, were you and I members of such an agency I believe we would thoroughly welcome this procedure.

"Public hearings on any community project are as American as they can be. I like to think that we would make more certain the public acceptance of the proposed legislation by writing into it the time-proven constructive American custom of a public hearing on a public question." 95 Cong.Rec. 4864 (1949).

Immediately thereafter, Senator Cain's amendment was agreed to by the Senate in a form not essentially different from the section ultimately enacted by Congress.[2] This legislative attention evidences at the least what one might have expected: a Congressional purpose to subject to public discussion and criticism of, as well as participation in the local authority's decision to proceed with projects designed to receive federal funding. The requirements of section 105(d) have been supplemented by the Secretary in his Urban Renewal Handbook, RHA 7206.1, chap. 3; these regulations ensure a well-publicized hearing at which all interested parties may be heard concerning the plan proposed by the LPA.

The procedure of § 105(d) was followed as to the original plan, and as to

that plaintiffs have no complaint. There is, however, no statutory provision governing the procedure to be followed should the original projects be changed after their submission to public scrutiny. As to any changes in the plan following the section 105(d) hearing, the Urban Renewal Handbook, id. at 1, says only that

"A proposed change in the project *may require* a new public hearing under the provisions of State or local law or the Contract for Loan and Grant. The LPA shall consult the Regional Office concerning the necessity for a new hearing." (Emphasis added.)

■ We think this provision of the regulations appropriately recognizes that Congress could not have intended that the LPA could gain public support for and agreement with a project, hold the required section 105(d) hearing, and thereafter change the Plan significantly and not be required to provide a meaningful hearing at which affected residents and property owners could challenge the local officials' decision. This is equally true when the land has been cleared and there are no people left for the LPA to relocate. Where a significant change in the Plan is proposed by the LPA or the developer, these plaintiffs would be entitled to the hearing contemplated by the Urban Renewal Handbook, a hearing devoted to the changes in the Plan. To hold otherwise would permit the local authorities to change the Plan either by revision of important aspects of one major project, or by the cumulative effect of several minor changes, without permitting the residents an opportunity as effective as they were initially entitled to if the projects had proceeded in the normal manner, the only eventuality contemplated by Congress.

2. The original amendment contained the following additional words at the end of the present section: "published not less than 10 nor more than 20 days prior to the date of such hearing." 95 Cong. Rec. 4864 (1949). The Secretary's regulations now embody similar requirements.

The passage of section 105(d) followed debate on another proposal by Senator

Cain to require a "referendum of voters in the locality at a general or special election" to approve any project seeking federal assistance under the Act. 96 Cong.Rec. 4807 (1949). This provision ostensibly was aimed at preventing the forcing of federal aid on local communities that did not want it. 95 Cong.Rec. 4845 (1949).

It may be said that these requirements for public hearing inure to the benefit of the public at large, and not to any group of individuals. However, the fact that all citizens of North Philadelphia and the City at large benefit from the urban renewal fostered by the Housing Act detracts from these plaintiffs' standing not one whit. The better reasoned decisions under the Housing Act have recognized the standing of representative individuals to seek vindication of procedural rights, Gart v. Cole, 263 F.2d 244, 250 (C.A.2), cert. denied, 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959); Powelton, supra, 284 F.Supp. at 821; as well as constitutional rights, Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 (C.A.2, 1968), and judicial review of the Secretary's determination that adequate relocation housing exists, Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 441–445 (N.D.Cal., 1968).

Our conclusions are reinforced by the decision in scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (C.A.2, 1965), cert. denied, Consolidated Edison Co. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). There, the Court interpreted section 313(b) of the Federal Power Act, 16 U.S.C.A. § 825*l* (Supp. 1969), which provides that

"[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order * * *."

The Court held that the Act protected values in which the plaintiff conservationists had exhibited a special interest, namely, "the conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites," 354 F.2d at 614, and that in order to insure that the Federal Power Commission protected the public interest in those values, the plaintiffs must be held to be within the term "aggrieved." 354 F.2d at 616. For the reasons advanced in Powelton, supra, 284 F.Supp. at 827–828, and Road Review League v.

Boyd, 270 F.Supp. 650, 660 (S.D.N.Y., 1967), we conclude that the term "aggrieved" contained in section 10(a) of the Administrative Procedure Act, 5 U.S. C.A. § 702 (Supp.1969), should be similarly construed. Common sense indicates that these plaintiffs, because they literally must live with the decision to change the Plan from sales units to rental, are the very persons who would have appeared at a public hearing to challenge the allegedly new use for land taken for a different purpose; they are therefore within section 10(a) and are entitled to challenge HUD's decision to permit Fairmount Manor and not require the LPA to hold a public hearing. We think it evident that these urban renewal area residents are sufficiently interested in the national goal of "well-planned integrated residential neighborhoods", 42 U.S.C.A. § 1441, and "well-organized residential neighborhoods of decent homes and suitable living environment for adequate family life," 42 U.S.C.A. § 1451(c), that they have standing to seek vindication of the values which the Housing Act seeks to further, and, because they are representatives of that class whose interests the procedural requirements of the Housing Act were designed to protect, it is clear that "no explicit statutory provision is necessary to confer standing" on them. Hardin v. Kentucky Utilities Co., 390 U.S. 1, 7, 88 S.Ct. 651, 655, 19 L.Ed. 2d 787 (1968); cf. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

While we decided that plaintiffs had standing to challenge the alleged departure from the procedures inferable from the congressional scheme, and accordingly denied the motion to dismiss, we were not certain that the rationale of *Powelton* applied to the determination made by HUD in this case. We made clear to counsel thereafter that our initial inquiry was whether any administrative remedy should be exhausted first. Subsequent proof concerning the issues involved in this case has confirmed our initial view that a procedural opportunity is not appropriate here. The parties'

settlement of that issue has, to be sure, somewhat mooted the problem, but because plaintiffs now contend that HUD failed in several respects to fulfill its obligation to provide a procedural opportunity, we are obliged to elaborate the basis for our decision. For the moment we will merely note that question, returning to it after it has been placed in better perspective.

## II.

### THE PRESENT MOTION TO DISMISS

Plaintiffs have adduced evidence to prove each of the following contentions: (1) HUD's original approval of Fairmount Manor was illegal and improper because (a) Fairmount Manor is contrary to the Plan, (b) its approval violated the Housing Act; and (c) approval was given without any "citizen participation" in the decision to build Fairmount Manor. Plaintiffs attack HUD's continued approval of the project on two additional grounds: (1) the project is illegal under the Civil Rights Acts of 1964 and 1968, and the Constitution, and (2) the administrative process followed by HUD was inadequate throughout. After plaintiffs rested their case, the defendants moved to dismiss under F.R. Civ.P. 41(b). For the reasons which follow, we have decided to grant that motion.

Taking the first group of arguments first, our initial inquiry is whether we are empowered to conduct judicial review of the Secretary's decisions under the Housing Act. The first issue which on this record can fairly be said to raise the question of reviewability is the Secretary's decision that Fairmount Manor was not a major change in the plan, and did not require a public hearing. The other issues are simply issues which the court is competent, and indeed, empowered to decide. Administrative Procedure Act, 5 U.S.C.A. §§ 706(2) (B), 706 (2) (C) (Supp.1969).

The reviewability of the Secretary's determination that adequate relocation facilities exist under 42 U.S.C.A. § 1455

(c) (1), (2) is established. See Western Community Addition Organization v. Weaver, 294 F.Supp. 433, 441–443 (N.D. Calif., 1968), and cases there cited. The issue before us is strikingly similar, although the determination is one made pursuant to inter-Department "regulation" and not statute. Here, the Secretary's designate, the Regional Administrator, has established a "red line" procedure, implemented to avoid holding a public hearing for every change in the original Plan, no matter how trivial. The Regional Administrator, Mr. Phelan, stated that HUD's experience with holding a public hearing for *every* change in the Plan had proven to be counter-productive:

"[W]e found that this kind of procedure repeated over and over again for the disposition or change of any parcel in any one of the five or six hundred projects we were dealing with, every time you went to move not only to change the inside development of a block or two, make adjustments that you find necessary as you proceed along the execution, timing and activities, whether you need to sometimes change street patterns or close a street or open a street or provide for public uses that hadn't originally been conceived of, we find we are making—consuming too much time and so we developed a technique of taking what we considered to be on the relatively insignificant, the minor changes, and handled them by what we call the red line procedure  *  *." N.T. 1125. See also, N.T. 1065.

The red line procedure was promulgated by a HUD memorandum from the Regional Office dated December 29, 1966. P. Ex. 68. Basically, the memorandum sets out a procedure which calls to the Regional Office's attention when the LPA considers a proposed change to be of a minor nature, and describes what a red line submission should be—"simple, dealing with one or perhaps two items  *  *  *  should not be a collection of random problems all running together in a confusing package"—and should not

be—"should not contemplate grant increases, changes in project boundaries, or changes to the category of project capability." P. Ex. 68, p. 1. The memo also sets out the standards which the agency will use to determine whether a proposed change will require a public hearing.

"Since all red pencil changes are changes to the renewal plan, they must be reviewed by the Planning Branch. Here is where the Regional Office determines:

(1) whether the change constitutes a material alteration in a basic element of the Plan; and

(2) whether or not the change is acceptable to us from a planning viewpoint." P. Ex. 68, p. 2.

█ The standards by which the Regional Office determines the necessity of a public hearing on any proposed changes in the Plan are, we think, countenanced in HUD's regulations as promulgated in the Urban Renewal Handbook, excerpted earlier:

"A proposed change in the project may require a new public hearing under the provisions of State or local law or the Contract for Loan and Grant. The LPA shall consult the Regional Office concerning the necessity for a new hearing." RHA 7206.1, p. 1.

HUD's own regulations are, of course, grounded on the Congressional grant of power to promulgate them framed in section 42 U.S.C.A. § 1455(c) (1) (Supp. 1969).[3] HUD has not seen fit to codify publicly the red line procedure, apparently because it considers the memorandum to treat interdepartmental operations. While the plaintiffs do not attack the red line procedure per se, it is clear that a congressional judgment could not be defeated by an agency's interdepartmental scheme. Thus to the extent that this procedure reflects the agency's judgment of the appropriate requirements in an area where the Housing Act is silent, that judgment must be implemented in a manner reasonably related to the enabling legislation under which it is promulgated. Thorpe v. Housing Authority of Durham, 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); see FCC v. Schreiber, 381 U.S. 279, 289–291, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965). We consider the red line procedure compatible with the congressional scheme, represented by § 105(d) of the Housing Act discussed above. HUD's major/minor distinction ensures that the political judgment made by the Housing Act has a chance to operate even after the land has been acquired—that any LPA proposal of scope sufficient to have provoked local objections if contained in the original Plan is as much exposed to citizen pressure as to the developers', and to the light of criticism both from the general public and the media. Accordingly, we are not concerned with the details of the modus operandi HUD chooses to follow in arriving at the judgment that a public hearing can be dispensed with and the change handled administratively. We only decide that the standard HUD employs to make that determination is a reasonable interpretation of the inferences arising from the Housing Act's procedural requirements.

█ The foregoing conclusions simplify the question of the reviewability of HUD's decision to approve Fairmount Manor under the red line procedure. It is now absolutely clear that there is a presumption of reviewability unless the statute authorizing agency action evidences a "clear and convincing" intent to preclude judicial review. Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). This presumption of judicial review obtains to one "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," Administrative Procedure Act

---

3. " * * * The Secretary shall issue rules and regulations to aid in implementing the requirements of this subsection and in otherwise achieving the objectives of this subchapter. * * * "

("APA"), 5 U.S.C.A. § 702 (Supp.1969), except to the extent that a statute precludes relief or the action is "committed to agency discretion by law," 5 U.S.C.A. § 701(a) (Supp.1969). The defendants do not, of course, contend that the statute precludes review; rather they argue that the Secretary's decision is discretionary, and discretionary to an extent which precludes our review of it.

■ In deciding whether HUD's decision under the red line procedure is encompassed within the exception of 5 U.S.C.A. § 701(a), several factors are relevant. *See generally*, Saferstein, NONREVIEWABILITY: A FUNCTIONAL ANALYSIS OF "COMMITTED TO AGENCY DISCRETION," 82 Harv.L.Rev. 367 (1968). While HUD had broad discretion to select the most effective and efficient methods of achieving the national housing policy, the decision not to require the LPA to hold a public hearing does not involve as broad discretion.

> "[O]nce appropriate rules have been established, the discretion conferred in day to day administration cannot have been assumed to extend to unreasonable deviation from such rules on an *ad hoc* basis at the whim of the Administration." Cappadora v. Celebrezze, 356 F.2d 1, 6 (C.A.2, 1966).

We think it clear that we are empowered to review the agency's adherence to its own procedural requirements, Thorpe v. Housing Authority of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), particularly where, as here, the statutory requirement for a hearing from which HUD's red line standards are drawn, 42 U.S.C.A. § 1455(d), is itself a mandatory requirement in every loan and grant contract. 42 U.S.C.A. § 1455; *see* Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 442 (N.D. Calif., 1968). Therefore, while we think it appropriate that HUD be given some discretion to implement the red line procedure, it seems clear that such discretion could not be beyond the reach of judicial review contemplated in the Administrative Procedure, Act, 5 U.S.C.A.

§ 706 (Supp.1969), which provides as follows:

> "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> \* \* \* \* \* \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law \* \* \*."

For support for the view that 5 U.S.C.A. § 706(2) (A) is the proper standard, *see*, Charlton v. United States, 412 F.2d 390, 397–400 (C.A.3, 1969), (Stahl, J. concurring).

Under the terms of the red line procedure, HUD's first inquiry is whether the proposed change constitutes a "material alteration in a basic element of the Plan." The judgment HUD is called upon to make is basically a factual inquiry directed to a relatively narrow set of facts, all of which are before HUD. The second standard—whether the proposed change "is acceptable \* \* \* from a planning viewpoint"—merely reiterates HUD's responsibility to exercise over-all review of the LPA's planning judgments, no less than for major revisions. We do not consider this second determination to be a judicially reviewable one.

The statutory scheme of federal grants-in-aid for urban renewal places the initiative for urban planning decisions at the local level, on municipal agencies which apply for federal funds. The review which HUD exercises over the LPA's planning decisions is therefore limited to excluding those planning choices which are incompatible with the goals of the Housing Act. Since choices of land use are limited by the development of adjacent areas, HUD could reasonably decide that of several possible

uses for a parcel of land, only one choice was incompatible with sound planning principles; choice of any of the others by the LPA would be permissible planning. That HUD does exercise such a limited review of planning choices is demonstrated by the following exchange:

"BY THE COURT:

"Q. Let me ask you this question, Mr. Phelan. Suppose the city planners came to you, and I am talking now about the Redevelopment Authority and the Planning Commission and they have an area that admittedly is in a blighted area and they want to put up in one block a glue factory and in another block a rubber factory, and in another block a paper mill.

Have you ever smelled a paper mill?

"A. Yes.

"Q. And right in the center of those they wanted to put up houses. Would HUD approve that?

"A. No, we wouldn't approve that because—

"Q. Why? Wouldn't that be economic feasibility?

"A. In part economic feasibility; in part we are trying to develop better environment and this would be so far beyond the realm of anything possible, and all these things—your proposition is so far beyond the realm of acceptability that even the City Planning and the City Fathers wouldn't approve it. You depend very heavily—

"Q. You missed my point.

"A. You would depend—

"Q. My assumption was they did approve it.

"A. We wouldn't consider that an appropriate expenditure of federal funds." N.T. 964–65.

Clearly, most planning decisions are far more sophisticated, and it is also obvious that HUD must evaluate an urban renewal plan not only in terms of its own internal validity, but its compatibility with adjacent areas of the city as well. The factors HUD must consider are multitudinous, and it must weigh them singly and in myriad combinations.[4] The decision to approve any given LPA planning choice must be based on HUD's planning experience and the expertise which experience engenders. This planning expertise is not only extensive, but it is not easily transferable to a reviewing court, not so much because of its technical nature, but because sensitivity to the intangibles of city planning comes only from broad experience with the subject matter; it is well described as "intuitive knowledge." Saferstein, *supra*, 82 Harv.L.Rev. at 383. These considerations are sufficient, we think, to render judicial review of HUD's planning judgments both unwise and inappropriate.

The injection of HUD's planning judgment does not preclude our ascertaining that HUD has properly exercised its discretion in resolving the first question,[5] "not merely in form but in substance, and that the administrative discretion vested in [HUD] is not arbitrarily abused * * *." Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 441 (N.D.Calif., 1968). It is HUD's negative decision on the first question which, after all, determines that, in order to further the efficient administration of the Housing Act, HUD will not require a public hearing at the local level. By exercising judicial review over that decision we are not interfering with the agency's review

---

4. For instance, in this case HUD approved Fairmount Manor on the condition that the LPA reduce the zoning density for the entire tract from 59 dwelling units per acre to 32. See P. Ex. 61, pp. 1 and 4. In addition, the Fairmount Manor proposal increased dramatically the number of off-street parking spaces. Mr. Phelan testified that after his review of the Fairmount Manor project he concluded "[t]hat the 221(d)(3) with rent supplement was a highly desirable use in this area." N.T. 1258.

5. See Saferstein, *supra*, 82 Harv.L.Rev. at 395–96; see also K. C. Davis, Administrative Law Treatise §§ 28.08, 28.16 (1958, Supp.1965).

of the delicate planning decisions which lie at the heart of urban redevelopment.

Initially, plaintiffs contend that HUD's failure to produce a written report from the Regional Office's Planning Branch on the August 1967 change which permitted Fairmount Manor is fatal to HUD's decision under the red line technique. This argument makes the erroneous assumption that HUD's internal procedures for making an *ex parte* determination are to be accorded the same force and effect as regulations governing a plenary, adversary adjudication. With primary responsibility under the Housing Act for the efficient management of federal urban renewal policy in HUD's hands, its determination that an informal procedure (which by its very terms is "not taken into official recognition in the Regional Office workload," P. Ex. 68, p. 2) provides the best balance of efficient use of limited resources and thorough review is, as we have indicated *supra,* a judgment entitled to our deference. Consistent with its informal nature, the red line memorandum does not require a written explanation of the Planning Branch's decision. Further, HUD's file on the approval of Fairmount Manor does contain the written, albeit conclusory, reviews and approvals by the necessary Regional departments. P. Exs. 82 & 61.

The question facing us at the outset is deceptively simple—what are the basic elements of the Plan? It is unfortunately not true that a Plan speaks for itself, although counsel would have had us so rule on several occasions. The two urban renewal Plans involved in this litigation are the Original Plan for East Poplar, dated October 24, 1958, P. Ex. 72, and the Fifth Amended Plan for East Poplar, dated June, 1964, P. Ex. 73. The Original Plan is composed of seven maps depicting the Urban Renewal Project's

Boundaries, Area (actually describing land use by block) Zoning, Street and Highway Adjustments, Public Utilities, Site Improvements, and Acquisition, Clearance and Rehabilitation areas. The Plan important for our purposes is Map No. 2. Its legend denotes the Fairmount Manor area, blocks numbered 31 and 32, as "RP"—"Rehabilitation by Purchasers (Single Family, Duplex, Multi-Family) 2, 3, & 4 Story Walk-up." P. Ex. 72. By an amendment of March 3, 1961, a portion of block 31, 31B, was changed from commercial to residential, single family houses for sale. N.T. 1117; P. Ex. 76. The Fifth Amended Plan of 1964 provides the same land use controls for these parcels, designating blocks 31 and 32 "Residential Use 1," which the Plan defines as "Detached, semi-detached and attached single-family duplex and multi-family dwellings (except rooming houses.)" P. Ex. 73, p. 4; N.T. 1218–19. There is no important difference between these two Plans in the applicable land use controls—both permit a variety of residential uses. We should point out, however, that the Plan which controls the question before us is the Amended Plan of 1964, since that is the last opportunity area residents had to participate in a public hearing. See P. Exs. 74 and 75. By using such a Plan as the frame of reference, a reviewing court can ascertain whether the Plan's basic provisions have been eroded by the cumulative effect of several "minor" changes without providing area residents an opportunity to be heard.

HUD contends that these land use controls are the determinative factors, are themselves the basic elements of the Plan and that the introduction of Fairmount Manor was acceptable renewal planning which did not change a basic element of the Plan. N.T. 1232–33a; 1026–27.[6] The plaintiffs counter that

6. "[BY THE COURT] Q. Why do you say it is not a major change?
    [BY MR. PHELAN] A. Because the plan itself provides for a variety. In that area of the Plan it provides for a variety of housing * * * of the kind we have described and because this residential rehabilitation of these houses was impossible of accomplishment at the time they had to be eliminated, and residential is being put back in." N.T. 1098–99.

home ownership is also a basic element of the Plan, even though the documents entitled "Plan" do not so state. Plaintiffs assert that urban renewal planning has ceased being physical rebuilding of areas, and now focuses on renewal of the entire community, buildings as well as the area resident's sense of place, so as to create or revitalize true neighborhoods.

They also argue, generally speaking, that there is a certain minimum of sales housing necessary in order to assure a stable residential neighborhood, and that too many apartments, particularly low rent or subsidized apartments, inevitably create a neighborhood without "roots," one which does not further the federal goal of "well-organized residential neighborhoods of decent homes and suitable living environment for adequate family life." 42 U.S.C.A. § 1451(c) (Supp. 1969).[7]

We are inclined to agree with the plaintiffs that some degree of home ownership was a basic element of the Plan. This position is implicit, we think, in the following colloquy:

"BY THE COURT:

"Q. I want to ask, suppose that this plan, the original plan had called for the entire East Poplar Urban Renewal Area to be dwelling houses and suppose that a change was requested which contemplated that the entire East Poplar Urban Renewal Area would be apartment houses, no dwelling houses at all.

Would you consider that to be a major change or a minor change?

"BY MR. PHELAN:

"A. I would consider that to be a major change.

"Q. Why? It is still residential.

"A. Because of the increases in the size and the character and significance to that extent.

"Q. Isn't that the same thing it will do—

"A. No.

"Q. —as far as Fairmount Manor?

"A. This has a relatively small impact in terms of size, in terms of what had to be done when the residences were eliminated, when the rehab structures were eliminated." N.T. 1100.

In this connection, it must be observed that the residential land use controls contained in the Fifth Amended Plan of June 1964 are only two in number: the all-inclusive "Residential–1", referred to above ("Detached, semi-detached and attached single-family duplex and multi-family dwellings (except rooming houses)"), and "Residential–2", a somewhat narrower classification:

"Group Dwellings and uses and public facilities required for the operation of the building or for the use or enter-

7. Plaintiffs point to the LPA's assurances in its brochures, circulated in 1963, *see, e. g.*, P. Ex. 6, that *"There will be no low-rent public housing in this area."* (Emphasis in original). Assuming for the purposes of this motion that rent supplement housing and the public housing programs *"serve by and large the same clientele and resemble each other in terms of performance,"* P. Ex. 47, exhibit 1, p. 1 (statement of Professor Niebanck) (emphasis in original), we can agree that these assurances are evidence of what the LPA, not a party to this action, considered its intentions with regard to the Plan. However, such expressions of intent are not binding on HUD, particularly when the testimony of Mr. Phelan is that the LPA's statements were not known to his office. N.T.

1292. Moreover, in reviewing HUD's decision to permit Fairmount Manor it is HUD's view of the Plan which is our focus. Further, the LPA is not a party to this suit, and would be subject only to state court jurisdiction. In a suit in state court it might be possible to bind the LPA by its assurances, *supra,* and such evidence as P. Ex. 64, an LPA memo concerning another proposal to insert 221(d) (3) housing in an area which the LPA had assured residents would be single family units for sale—the memo indicates that the LPA considered itself obliged to honor those assurances. *But cf. Harrison-Halstead Com. Group Inc. v. Housing & Home Finance Agency,* 310 F.2d 99, (C.A.7, 1962) cert. den. 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 414 (1963).

tainment of guests or tenants of the building." P. Ex. 73, p. 4.

Since there is no land use control providing solely for single family units for sale, violation of the land use control is not possible simply by substituting rental units for sales units. If land use controls were the sole determinant, wholesale revision of the Plan's residential areas would be possible without holding a hearing. Since it is not possible, according to Mr. Phelan's testimony, the number of units changed from sales to rental could apparently be great enough to create a "major" change in the Plan.

However, even assuming that a degree of sales housing is an element of the Plan, we do not think that plaintiffs have shown that HUD abused its discretion in deciding that Fairmount Manor did not materially change this element. A problem we face at the outset is defining the boundaries of the relevant housing area. The boundaries of the East Poplar Urban Renewal Plan are logical limits, it would seem, but the plaintiffs' calculations include apartment projects not within the Plan but adjacent to it, to wit: Spring Garden Apartments and Penn Towne Apartments, located between 7th and 8th Streets, and between Green & Wallace Streets, and Wallace & Fairmount Avenue, respectively. See P. Ex. 47, exhibit 2, p. 5; Plaintiffs' Complaint, ¶ 24(b); Plaintiffs' Brief, pp. 31–32. However, these projects are historically related to the East Poplar area, having been the subject of early renewal efforts, and are properly considered within the East Poplar neighborhood. See N.T. 970–72 (testimony of Mr. Phelan).[8]

Using the boundaries of the East Poplar Plan, plus the blocks developed under earlier renewal programs, plaintiffs correctly assert that Fairmount Manor eliminated 25 single family homes for sale on Block 31B. N.T. 1322. They would add to this figure the 70 houses on Blocks 31A and 32 which were to be rehabilitated (an additional 30 rental units were expected from the one four-story building and the upper floors of the 25 three-story buildings). P. Ex. 27; Plaintiffs' Brief p. 4. If we were to agree that the 70 "rehabs" should be considered sales units "lost" because of the decision to approve Fairmount Manor, the following figures obtain. As the Plan and its projects presently provide, there are 762 rental units and 283 sales units in the East Poplar area. N.T. 1260. If the rehabs had been rehabilitated, there would be 682 rental units (762–110 [Fairmount Manor] + 30 [rehab units]) and 378 sales units (283 + 70 [rehabs] + 25 [Block 31B]. The net change in sales housing as a percentage of all housing in the East Poplar area would be 5.6% (32.6% sales housing with successful rehabilitation, and 27% sales housing with Fairmount Manor). As a percentage of sales housing, there would be a loss of 25%, a not insignificant drop. However, it is clear that all 70 structures would not have been rehabilitated.

The testimony of plaintiffs makes it clear that as of March 1966, they considered the 70 rehabs to be in a dangerous condition and to represent a hazard to the neighborhood. See, e. g., N.T. 855. Their views were conveyed to the LPA in a "White Paper", D. Ex. 14[9]

---

8. Some of the plaintiffs' other figures included Richard Allen Homes, a public housing project of 1324 units, and Cambridge Plaza, a 372 unit public housing project, both west of the Reading Railroad tracks at the western edge of the East Poplar area. See Complaint ¶ 24(b); P. Ex. 47, exhibit 2, p. 5. Defendants countered that equally relevant was the planned construction of over 350 single family homes for sale north of Girard Avenue, adjacent to the Northwestern edge of the East Poplar

Renewal area. See N.T. 1452–55. We have decided to exclude all these housing units from consideration because we are unable to resolve the question of boundary definition on the present record other than as we have indicated.

9. " * * * [T]he rape of a school crossing guard at Sixth and Master Streets by a group of teenage boys in early November 1965 concluded in an abandoned house on 7th Street between Fairmount Avenue and Green Street.

which was the moving force behind demolition of the structures. See P. Exs. 58 and 67. A letter from the LPA to HUD accurately summarizes the conditions then existing.

"By now, all the structures have been totally vandalized—many of them have been completely destroyed by fire and water. Even though boarded up, they are constantly being re-entered and have become the haunts of transients and gangs. The maintenance costs, just to eliminate code violations, are tremendous. In short, these structures are a major source of trouble to the Authority and the community and constitute an economic, social, physical and moral liability." P. Ex. 52, p. 1. See also, P. Ex. 58.

At that time, there were only 8 structures conveyed to the developer, Singer, with the remainder still owned by the LPA. The following HUD memo makes clear that the remainder were by then not capable of rehabilitation.

" * * * [A] detailed examination of the properties and required financing by the Redevelopment Authority and interested redevelopers indicated that rehabilitation of these properties was not economically feasible. In view of the poor condition of the structures, the fact that they served as an attraction to undesirable and criminal elements, and in response to the request of adjacent property owners, the Redevelopment Authority requested and received an Urban Renewal Plan change permitting demolition * * *. Approval was given by the Regional

Office in a telegram of March 8, 1966. In accordance with this plan change, these structures were demolished in April. The cost of demolition of the eight properties conveyed to Singer was borne by him." P. Ex. 60, p. 1.

Further, since the sales price of the rehabs was approaching the sales price of new houses in the area, " * * * FHA was extremely cautious in issuing commitments for these units." P. Ex. 52, p. 1. See also, P. Ex. 67 (LPA letter to HUD: "[Singer] unable to obtain an FHA commitment"). We have concluded, therefore, that the 70 units were not lost units of sales housing unless they were replaceable as sales housing. The evidence on this point indicates, and we so find, that they were not.

■ After the demolition of the 70 rehabs, Singer proposed the introduction of 221(d)(3) garden apartments on that site.[10] See P. Ex. 57 (HUD memorandum). Before this proposal received final approval, some of the plaintiffs sought the use of a lease-purchase plan with the proposed housing; their efforts continued for the better part of a year. See P. Exs. 17, 23, 24, 25, 28, 32, 33, 34, 37, 39, 40, 44. The plaintiffs also sought the substitution of sales housing for the subsidized rental housing, see D. Ex. 4, and HUD expressed its willingness to expedite any new application to FHA "designed to respond to citizens' request for fewer and larger sales units", P. Ex. 65 (letter of Mr. Phelan, June 10, 1968). Plaintiffs were evidently unsuccessful in their efforts to obtain a developer for sales housing since no other proposal for

---

"This house is in an abandoned block of properties which the Redevelopment Authority acquired over five years ago. There have been six fires in these houses and innumerable police calls for vandalism with the most desperate chapter the discovery by a junkman of a woman's head in one of the basements. * * *" D. Ex. 14, p. 2. The "White Paper on Housing and Urban Renewal in North Central Philadelphia" is a seventeen page, sharply critical analysis of the acute housing deficiencies existing in that area as of November, 1965. It was compiled

by the Friends Neighborhood Guild, one of the moving forces in East Poplar's renewal and a plaintiff in this action.

10. The evidence indicates that Singer was not in default on his contract when the buildings were demolished. See P. Ex. 3, ¶7 (development contract); P. Ex. 60, p. 1 (HUD memorandum). Further, a different group of developers was considered for the 221(d)(3) project, but was unable to raise the necessary capital. See P. Exs. 58, 56 and 67.

the development of the Fairmount Manor site was ever tendered by a developer, and the land lay fallow for a year. On these facts, with only the Singer proposal before the LPA, we cannot conclude that the 70 rehabs were replaceable as sales units; and without a showing that they were, we cannot conclude that HUD abused its discretion in approving Fairmount Manor. A far different case would be presented if the LPA had refused a developer's application to build sales housing, and HUD had thereafter approved the LPA's choice of the Singer proposal for 221(d)(3) units, for those facts would squarely raise the issue whether HUD could permit such a reduction in the amount of sales housing (25%) without requiring a public hearing on that change. On the facts before us, the Fairmount Manor project eliminated 25 sales units on Block 31B, or 8% of the planned sales housing (283 present sales units plus 25 sales units on Block 31B yields 308 sales units without Fairmount Manor). This change is certainly *de minimus*. We hold, therefore, that HUD did not abuse its discretion in approving Fairmount Manor without requiring a public hearing at the local level.

### III

### THE PROCEDURAL OPPORTUNITY

*Powelton* required the Secretary to afford the Urban Renewal Plan's relocatees "an opportunity equal to that available to the Redevelopment Authority to submit written and documentary evidence on the legality of the plan." 284 F.Supp. at 831–832. The underlying reason for directing the Secretary to consider the plaintiffs' written submission was that

"* * * in this case, and in most if not all cases, the Secretary's decision is based upon evidence, information, and conclusions contained in written data prepared and submitted by the local public agency (*e. g.*, the Philadelphia Redevelopment Authority). * * *" 284 F.Supp. at 831.

Thus, an adversary presentation of data for HUD's determination of the adequacy of relocation housing was singularly appropriate, since HUD administrators necessarily relied on the LPA's estimates and statistics, figures which might be optimistic, or not always accurate. These same policy considerations are not present in the determination made by HUD under the red line procedures. As should be clear at this point, HUD has available all the relevant data with which to measure the magnitude of change involved in any project substitution or alteration. Further, because we have decided that the red line procedure is judicially reviewable, a decision reserved in *Powelton*, there is less need for what would be a duplicative review of the red line decision. We therefore decline to apply *Powelton* to the facts of this case.

### IV

### THE HOUSING ACT

■ Plaintiffs argue further that the Housing Act was violated by HUD's concurrence in the Fairmount Manor project. Their first contention is that the Housing Act states such a strong preference for sales housing that it does not permit the erection of rental housing on this site. Plaintiffs' Brief, pp. 33–35. See 12 U.S.C.A. § 1715z (Supp.1969). There is no merit to this contention. As the plaintiffs themselves concede, Plaintiffs' Brief p. 15, "HUD has broad discretion to choose between alternative methods of achieving the 'national housing objective'" as declared in the Housing Act, 42 U.S.C.A. § 1441 (Supp. 1969). We agree with Mr. Phelan's view that "the Housing Act has a balanced program" of rental and sales housing. N.T. 1256.

"[The Housing Act] has much housing for low-income families. It provides about $400 million a year for public housing and provided last year only $25 million for this particular home-ownership subsidy program [§ 235, 12

U.S.C.A. § 1715z (Supp.1969)] and didn't get it funded until the fall.

Much more money is put into rental activity by the Congress and by the Administration than into homeownership programs. Even when they put the 235 program into effect * * * they also put into effect the 236 program [12 U.S.C.A. § 1715z–1 (Supp.1969 (rental subsidy)] for the same amount and maintained and increased in fact the public subsidy programs * * *." N.T. 1256.

The plaintiffs place great emphasis upon the "desirability of sales housing versus rental property", Plaintiffs' Brief p. 31. See also P. Ex. 47, exhibits 1–4 (plaintiffs' experts), 11–27 (plaintiffs). But the desirability of one course of action certainly does not preclude another. There is simply no basis for the argument that the Housing Act forbids Fairmount Manor; despite the plaintiffs' argument that "we might be faced with alternative emphasis in the Act," Brief p. 35, we are. And HUD has, as plaintiffs concede, broad discretion to permit choices between them.

■ Plaintiffs also argue that the Housing and Urban Development Act of 1968 imposes an obligation on HUD which it failed to carry out, namely, require, in consultation with the Secretary of Labor, "to the greatest extent feasible", that housing projects receiving below market interest rates give training and employment opportunities to lower income persons residing in the areas of such housing. 12 U.S.C.A. § 1701u(1) (Supp.1969). Subsection two contains a similar requirement for utilization of business firms within the area. Even if we assume that any third party has standing to require the insertion of contractual provisions pertaining to area labor and businesses in the contract between the LPA and the developer, Plaintiffs' Brief p. 36, such a plaintiff would have to be adversely affected by such omission and there is absolutely no proof that any named plaintiff or member of the class repre-

sented has been or will be damaged or harmed by the failure to include such provisions. Neither are there any allegations to that effect. Accordingly, we move on to other arguments.

■ The plaintiffs' last argument under the Housing Act is that HUD's approval of Fairmount Manor is void "because of the absence of appropriate citizen participation." Brief, p. 37. There is no statutory command in the Housing Act for citizen participation, but the Secretary has issued some regulations treating the subject and incorporated them under the umbrella of the "workable program" requirement of 42 U.S.C.A. § 1451(c) (1) (Supp.1969). Under that section, the Secretary must certify that there exists a workable program before HUD enters into any loan or grant contract or insures any mortgage under 12 U.S.C.A. §§ 1715l (d) (3) or 1715k (Supp.1969). See 42 U.S.C.A. § 1451(e) (Supp.1969). This requirement applies not to any particular project, but to the entire City of Philadelphia in order to render the city eligible for federal loans and grants under the Housing Act. See Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 445 (N.D. Calif.1968). The workable program is required, says HUD,

"to ensure that communities desiring to utilize funds for renewal and housing programs understand the array of forces that create slums and blight and are willing to recognize and take steps within their power to prevent and overcome urban blight." RHA 7100.1, chapter 1, p. 1.

The "requirement" for citizen participation is contained in one of the Program Guides HUD has published to flesh out the constituent parts of a workable program. Program Guide No. 7 describes a "community-wide" "Citizens Advisory Committee" composed of persons representative of the city's economic, civic, educational, and minority groups, to name a few, and suggests methods for ensuring that the Committee can participate effectively in the

City's renewal efforts. However, the committee described in Program Guide No. 7 is not a *requirement* of the city's workable program under the Housing Act, since the Urban Renewal Handbook clearly states that "[g]uides are used to provide program participants with material of an *advisory nature*." RHA 7200.0, Transmittal Notice p. 2. (Emphasis added). *Compare* Thorpe v. Housing Authority of Durham, 393 U.S. 268, 275 n. 20, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). We conclude, and plaintiffs apparently concede, Brief, pp. 37–38, that there are no HUD-created provisions for "citizen participation" within the aegis of the Housing Act which were required by their own terms in connection with Fairmount Manor.[11]

Fairmount Manor is, however, within a Model Cities area, N.T. 1284, and there is a statutory provision for "citizen participation" contained in section 103(a) (2) of the Model Cities Act, 42 U.S.C.A. § 3303(a) (2) (Supp. 1969), which defines those qualities a Model Cities program must possess before federal monies will be made available:

"A comprehensive city demonstration program is eligible for assistance * * * only if—

* * * * * *

(2) the program is of sufficient magnitude to make a substantial impact on the physical and social problems and to remove and arrest blight and decay in entire sections

or neighborhoods; to contribute to the sound development of the entire city * * * and to provide * * * widespread citizen participation in the program * * *."

As with the "workable Program" under 42 U.S.C.A. § 1451(c) (1), the Secretary must "determine" that a locality's plans meet the specifications of the statute, namely, section 103(a) (2). 42 U.S. C.A. § 3305 (Supp.1969). The HUD interpretation of "citizen participation" is contained in its Model Cities Manual, MCGR 3100.3, which states, in part, that

"HUD will not determine the ideal organizational pattern designed to accomplish this objective. It will, however, outline performance standards for citizen participation which must be achieved by each City Demonstration Agency. It is expected that patterns will vary from city to city, reflecting local circumstances. The city government, as the principal instrument for carrying out the Model Cities program, will be responsible for insuring that *whatever organization is adopted provides the means* for the model neighborhood's citizens to participate and be fully involved in policy-making, planning and the execution of all program elements. * * *" (Emphasis added).

HUD's notion of "performance standards for citizen participation in model cities

---

11. Plaintiffs suggest that the citizen participation provisions of the Model Cities Act be analogized to the Secretary's requirements under the workable program of the Housing Act. But this analogy provides them no assistance. LPA Letter 458, P. Ex. 78, apparently the fountainhead of citizen participation in the workable program, "*requires* the establishment of a Project Area Committee (PAC), made up of residents of the project area, for all urban renewal projects *which involve residential rehabilitation* and which are not yet in execution." Id. at 1. (Emphasis added). (The Letter specifically does "not apply to urban renewal projects in model neighborhoods under the Model

Cities Program." Id.). The Letter only "*encourages* the establishment of a PAC for all other urban renewal projects, in which residental rehabilitation activities are *not* contemplated * * *." *Id.* at 2. (Emphasis added). That residents' co-operation is essential to successful rehabilitation is apparent, *see* Krasnowiecki, Housing and Urban Development, 429 (1969), but HUD has decided that for other projects the "increased citizen participation" of Letter 458 "is not a program requirement." Id. Region II's letter implementing HUD's Letter 458, P. Ex. 79, does not require anything additional for non-residential-rehabilitation projects.

neighborhood programs" is stated in equally vague terms:

" * * * [T]here must be some form of organizational structure, existing or newly established, which embodies neighborhood residents in the process of policy and program planning and program implementation and operation." Id.

The thrust of "citizen participation" seems to be that there must be an institutional conduit designed to ensure that "neighborhood views *can* influence policy, planning and program decisions. * * * " Id. (Emphasis added). As we understand HUD's view of "citizen participation", it requires a local organization comprised of representative spokesmen for the Model Cities area residents, recognized by the residents as such. The organization functions as a consultant to the LPA, with its role defined by the organization itself; it is not ceded any particular powers. HUD does not seek to ensure that the form of the organization's "participation" follows any particular procedures. HUD says simply that

" * * * implementation of this statutory provision requires: (1) the constructive involvement of citizens in the model neighborhood area and the city as a whole in planning and carrying out the program, and (2) the means of introducing the views of area residents in policy making should be developed and opportunities should be afforded area residents to participate actively in planning and carrying out the demonstration." Id.

Plaintiffs concede that "[t]he definitive shape of citizen participation in planning under the Model Cities Act was something obviously left to emerge from experimentation," but argue that "there is an irreducible minimum content to the statutory command." Brief, p. 37. However, HUD has interpreted the statutory criteria for those plans which are qualified to receive Model Cities grants to require only the institutionalization of a citizens' voice. We cannot say that HUD's interpretation is an unreasonable one. HUD has not purported to vest in the citizens' organization a veto power over individual projects, and plaintiffs do not contend that they should have. While HUD clearly does expect some sort of overall collaboration between the LPA and affected citizens, Mr. Phelan indicated that he did not consider it his function to force any kind of consultive relationship on the LPA and its citizens' group. This position is consistent with section 103(b) (1), 42 U.S.C.A. § 3303(b) (1) (Supp.1969).

The Area Wide Council, the citizens' group for the Model Cities area covering East Popular, stated that it was never consulted about the "advisability" of Fairmount Manor. P. Ex. 47, exhibit 9. On the facts of this record we do not find that surprising. The Model Cities Manual "policy statement" from which we quoted, supra, is dated November 30, 1967; there is no indication whether this "policy" was in effect before that time or was only promulgated as of that date. The Fairmount Manor project was approved by the LPA on March 17, 1967, P. Ex. 4, p. 16; the contract for Fairmount Manor was signed by the LPA and Singer on September 26, 1967, Id. at 1, and placed on the Philadelphia City Council calendar as Bill No. 32 on January 25, 1968, D. Ex. 13, p. 4 (hearings were held on the approval of the contract on March 27, 1968, D. Ex. 14). On these facts, the failure of the LPA to seek the views of the Area Wide Council, formed late in the Fall of 1967, N.T. 1285; Plaintiffs' Brief, p. 39, is understandable. Certainly this single instance of the LPA's failure to consult with the Area Wide Council does not demonstrate a departure from the statute's requirement of "widespread" citizen participation in the over-all Model Cities program; nor does it provide a basis for our finding that HUD abused its dis-

cretion in determining that the Philadelphia Model Cities program satisfied the statutory requirements.

## V

### THE CIVIL RIGHTS ACTS

Plaintiffs argue that "Congress has directed HUD to use its programs in an *affirmative* way to eliminate racial segregation in housing, and even if Congress has not so directed, the Constitution requires that HUD's policy toward racially segregated housing patterns * * * must be held up to the same affirmative standards as the policy of local school boards with regard to school integration." Brief, pp. 42–43. (Emphasis in original). Even if we agree with plaintiffs on their legal contention, there is no evidence on this record that, in approving Fairmount Manor, HUD failed to meet the standards plaintiffs have advanced.

At the outset, it is clear that the plaintiffs have failed to exhaust any of the administrative remedies HUD has promulgated under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d–1 (Supp.1969). 24 C.F.R. §§ 1.1, 2.1 et seq. There is also a question whether their claims under the Fair Housing Act of 1968 should not be processed under the procedures established therein. See 42 U.S.C.A. §§ 3610 and 3611 (Supp.1969). Although their submission of these questions in their "procedural opportunity", P. Ex. 47, pp. 12–18, may have satisfied the requirements under these latter provisions, we pass over these threshold technicalities because we have concluded that plaintiffs must, on this record, fail on the merits of their contentions.

The regulations promulgated under the Civil Rights Act of 1964 apply to the Housing Act of 1949, as amended, 42 U.S.C.A. § 1450 (Supp.1969), but they do not by their terms apply to the rent supplement program under 12 U.S.C.A. § 1701s, or the financing provisions thereof, 12 U.S.C.A. § 1715*l*. However, plaintiffs point to Title VIII of the Fair Housing Act of 1968, 42 U.S.C.A. § 3601 et seq. (Supp.1969), and the provision of section 808:

> The Secretary of Housing and Urban Development shall—
>
> *   *   *   *   *   *
>
> (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C.A. § 3608(d) (5) (Supp.1969).

They argue that the Secretary is required to implement the rent supplement programs in such a way that he "affirmatively" furthers desegregation. Plaintiffs contend that he has not done so in this instance, and, further, that without any published guidelines under the Fair Housing Act HUD's approval of Fairmount Manor is void.

There are several answers to these arguments. First, it is clear that HUD has established policies which treat the problems plaintiffs raise. HUD's regulations under Title VI provide, in relevant part:

> "A recipient [which includes an LPA], in determining the location or types of housing * * * which will be provided * * * may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race * * *." 24 C.F.R. § 1.4(b) (2) (i) (1969).

Plaintiffs correctly point out that these regulations "recognize the relevance of site selection to racial discrimination in federal programs," Brief, p. 48, and that

" * * * HUD leapfrogged the usual stage of civil rights development which requires a showing of discriminatory *intent* and went directly to the stage which prohibits action which has a discriminatory effect. See 'Relocation, Accidental Inequalities and the Equal Protection Doctrine', 117 U.Pa.L.Rev. 579 (1969)." Id.

HUD's Low Rent Housing Manual, § 205.1, ¶ 4(g) provides that

"[a]ny proposal to locate housing only in areas of racial concentration will be *prima facie* unacceptable and will be returned to the Local Authority for further consideration."

This position was corroborated by Mr. Phelan's affirmance of the correctness of plaintiffs' submission, P. Ex. 47, exhibit 7. N.T. 1354–60. Yet because HUD has not published regulations specifically including 221(d) (3) programs, plaintiffs would have us grant them relief. This failure, if such it is, does not justify our granting plaintiffs relief absent proof that the placement of Fairmount Manor and other 221(d) (3) projects evidences site selection which does not further desegregation in housing. What proof there is on this question shows without dispute that rent subsidy housing is evenly and well dispersed within the city as well as without, in both ghetto and non-ghetto areas. N.T. 1461; 1515. *Compare* Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907, 909–914 (N.D.Ill., 1969); Hicks v. Weaver, 302 F.Supp. 619 (E.D. La.1969).

We have considered the plaintiffs' other contentions and they are without merit. The defendants' motion to dismiss is

Granted.

The foregoing shall be deemed our Findings of Fact and Conclusion of Law.